732

ROBERT L. BROCK AND MARJORIE BROCK, ET AL.,[1] PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1165–70, 1836–71, 1118–72. Filed March 6, 1973.

*Harry Margolis*, for the petitioners.
*Sheldon M. Sisson*, for the respondent.

#### OPINION

DAWSON, *Judge:* In these consolidated cases the respondent determined the following Federal income tax deficiencies and additions to tax:

| Petitioners | Docket No. | Taxable year | Deficiency | Addition to tax sec. 6653(a)[2] |
|---|---|---|---|---|
| Robert L. and Marjorie Brock | 1165–70 | 1965 | $9,822.00 | $491.10 |
| Leon and Barbara A. Boro | 1836–71 | 1966 | 1,001.71 | 50.08 |
| Simon and Frances Zentner | 1118–72 | 1967 | 2,078.31 | 103.92 |
| | | 1968 | 2,110.00 | 106.00 |
| | | 1969 | 2,460.00 | 123.00 |

When these cases were submitted to the Court there were 23 other cases pending which involve the same subject matter. At the trial the Court was informed that 10 more petitions involving identical questions of fact and law would be filed. The petitioners herein were selected as being representative of the classes of persons involved— identified as group A, group B, and group C. The parties have stipulated that final decisions in the instant cases will be followed with respect to "all of the cases arising out of all the Duncan property Ventures relationships."

---

[1] Consolidated herewith for trial, briefing, and opinion are the cases of Leon Boro and Barbara A. Boro, docket No. 1836–71, and Simon Zentner and Frances Zentner, docket No. 1118–72.

[2] All statutory references herein are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

We must decide whether the petitioners in all three groups are entitled to deduct the full amount of the interest payments they made during the years in question; and whether the petitioners (Zentners) in group A are also entitled to a deduction for taxes paid in the years 1967 through 1969. A secondary issue is whether the petitioners are liable for the additions to tax under section 6653(a).

All of the facts have been stipulated. The comprehensive and detailed stipulations of facts, together with exhibits attached thereto, are incorporated herein by this reference and are adopted as our findings. To the extent deemed pertinent the salient facts will be set forth below.

At the time the petitions in these cases were filed Robert and Marjorie Brock (partners in group B) resided in Beverly Hills, Calif.; Leon and Barbara Boro (partners in group C) resided in Fresno, Calif.; and Simon and Frances Zentner (partners in group A) resided in Las Vegas, Nev.

Donald F. Duncan, a successful and distinguished inventor, created the Duncan Yo-Yo and the Duncan parking meter. He earned and spent substantial sums of money. During the 10 years before his death in 1971 he needed more money. Duncan was and had been for several years the owner of 436 acres of unimproved realty located in Cucamonga, Calif. (This property will be referred to as the Duncan property.) Beginning in 1963 Duncan engaged various real estate agents to find a buyer for the property.

The Duncan property in San Bernardino County fronts on two main boulevards and has great potential value if developed. It is presently vacant and used only for grazing purposes. A real estate agent seeking a purchaser for the property brought it to the attention of Harold M. Plant, a certified public accountant. Plant had been counsel to various clients, many of whom receive high earned income and are interested in ways to shield such income from Federal income taxes. The transactions planned by Plant are designed to maximize economic and tax leverage. The way Plant seeks such leverage is by postponing any payments of principal on a debt while currently paying only the accruing interest. The property is usually sold prior to the time the principal amount is due with the proceeds used to pay off the indebtedness previously incurred.

When the Duncan property was first brought to his attention by McNay Realty, Plant expressed no interest in assembling a group of investors to purchase it. However, by 1965 his intentions had changed and he became interested in purchasing the Duncan property for his clients. Although Plant had personally participated, along with his clients, in several land projects in the past, he has never had any financial investment in the Duncan property.

The Duncan property had a fair market value in 1965 of $1,550,000. Plant encountered difficulty finding a sufficiently large group of investors able to secure the necessary financing as well as to continue payments on the property during the period prior to the hoped-for development. As unimproved real property it was generating only the smallest income. From 1965 through 1971 this income totaled $3,000. During the same period the real estate taxes increased rapidly, as follows:

| Year | Amount | Year | Amount |
|---|---|---|---|
| 1965 (partial) | $3,784.79 | 1969 | $34,944.24 |
| 1966 | 17,486.49 | 1970 | 45,346.83 |
| 1967 | 27,475.25 | 1971 | 55,342.99 |
| 1968 | 30,947.74 | | |

While attempting to put together a sufficiently large group of investors, Plant brought the proposal to Harry Margolis, an attorney in Saratoga, Calif. Plant and Margolis had participated in various ventures together in the past. Until brought to his attention by Plant, Margolis had no knowledge of the availability of the Duncan property.

Plant contacted a number of his clients and obtained tentative commitments from several of them. During this time Plant and Margolis represented Maria Cole, the widow of Nat "King" Cole. Plant suggested that Maria Cole take the balance of the property that the other clients would not take. It was later decided that she would make no investment in the property, but would assume a different role.

In early June 1965, Plant and Margolis were engaged in extensive efforts to assemble a sufficiently large group of investors. Both had become convinced of the value and potential of the property and did not wish to lose it for their clients. Late in June and early in July 1965, the seller began exerting considerable pressure in order to hasten consummation of the sale.

During this time Margolis also represented North American Financial Corp. (NAFCO), which was incorporated in California on February 7, 1962. It was inactive until July 1, 1964, when it was acquired by Universal Decorating Leasing Corp. which came into existence on that same day. NAFCO was activated to engage in the loan servicing and real estate business which it took over from the McMillan Mortgage Co. The McMillan Mortgage Co. was being acquired by the Fidelity Bank and as such was obliged to dispose of many millions of dollars of assets then held by McMillan Mortgage Co. These assets were in the form of an extensive mortgage portfolio. NAFCO collected the payments as made and remitted the proceeds to the lending institutions which had made the original loans.

Faced with the pressure from Duncan and the desire to secure the land for his clients, Margolis approached NAFCO to see if it had any

interest in purchasing the Duncan property. NAFCO agreed to advance the funds necessary to acquire the property. This was done in reliance on the promises of Margolis and Plant that they would provide clients who would buy out NAFCO in a reasonable period of time under terms and conditions satisfactory to NAFCO. NAFCO also demanded the exclusive management of the property as well as the opportunity of financing those who would initially purchase its interest in the property. As a further condition, NAFCO secured the right to finance the development of the property and to receive a 10-percent share of any profit on its later development or sale. To secure legal and accounting services, NAFCO employed Margolis and Plant. It was understood that their professional fee would be paid from the potential profit participation NAFCO had retained for itself.

On July 20, 1965, NAFCO took title to the Duncan property under an escrow with Security Title Insurance Co. NAFCO paid in cash $235,200 of its own funds into the escrow. Of this sum, $95,200 was prepaid interest and $140,000 was applied to reduce the principal of $1,550,000. Various unspecified closing costs as well as one-half the escrow fee were also paid by NAFCO at that time.

The $1,410,000 principal amount of the debt was represented by a loan from Southwest Savings & Loan Association of $500,000 on a first deed of trust, eight second-trust deeds made payable to Duncan totaling $835,000, and eight third-trust deeds totaling $75,000. All debt instruments bore interest at 7 percent. The third-trust deeds were payable to the real estate brokers involved in the transaction and were part of their commissions.

Within 2 weeks after NAFCO settled on the Duncan property it concluded an agreement of sale and entered into a partnership with four individuals in order to dispose of part of its purchase pursuant to its original understanding with Plant and Margolis. NAFCO retained a 65-percent interest in the partnership. In relevant part the agreement of sale contained the following provisions:

### AGREEMENT OF SALE

THIS AGREEMENT is entered into this 2nd day of August, 1965, by and among North American Financial Corporation, a California corporation, hereinafter referred to as NAFCO, and Percy Faith, Alan Gleitsman, Berle Adams, and Simon Zentner, hereinafter referred to as Group A.

### WITNESSETH:

WHEREAS, NAFCO has purchased 436 acres, more or less, in an unincorporated area in San Bernardino County being described in Book 6434 at page 170 in a deed running from Donald F. Duncan to NAFCO, recorded July 20, 1965, and

WHEREAS, Group A desires to purchase a portion of NAFCO's interest in said property.

Now, THEREFORE, in consideration of the mutual promises of the parties hereto, it is hereby agreed:

1. NAFCO acknowledges receipt of ($12,500.00) TWELVE THOUSAND FIVE HUNDRED DOLLARS each from Berle Adams, Simon Zentner and Alan Gleitsman, and FIFTY THOUSAND DOLLARS ($50,000.00) from Percy Faith. Said sums shall in each case represent five per cent (5%) of the total NAFCO interest under the Donald F. Duncan purchase for Berle Adams, Simon Zentner and Alan Gleitsman, and the payment of Percy Faith shall represent twenty per cent (20%) of such NAFCO interest. This purchase by Group A shall be thirty-five per cent (35%) of the NAFCO interest as purchased by NAFCO from Donald F. Duncan under the agreement dated July 13, 1965, and shall be subject to all of the terms and conditions of that agreement except as expressly modified in this agreement.

2. NAFCO shall receive ten per cent (10%) of the net proceeds from the disposition of all of the property beneficially owned by Group A and covered by this agreement.* * *

3. NAFCO expressly reserves the right to dispose of its remaining sixty-five per cent (65%) interest hereunder without prior consultation with or the consent of the parties to this agreement.

4. NAFCO is to be the sole manager of the property. It shall receive no payment for such services. NAFCO has retained Harold M. Plant, C.P.A., and Harry Margolis, Esq., as accountant and counsel respectively in connection with this project and will compensate them entirely and solely as its own responsibility. NAFCO will delegate its authority to Mr. Plant and Mr. Margolis so that either of them may act for all of the owners of the property under this agreement. NAFCO approval in writing shall be required before any action which affects the parties to this agreement may be taken. The approval of members of Group A shall not be required for any purpose hereunder.

The agreement was effective only upon the approval of all members of group A. This approval was forthcoming. Thus group A paid $87,500 for 35 percent of the total NAFCO interest in the Duncan property. As to this partnership, NAFCO retained a 65-percent interest. Group A was obliged to assume the burdens as well as obtaining the benefits of the purchase of the Duncan property made by NAFCO.

In his notices of deficiencies the respondent disallowed all the losses reported by the group A partnership. The claimed deductions were primarily for taxes and interest paid during these years. Taxes, totaling $215,338.34, had been paid entirely by group A.

Under paragraph 3 of its agreement with group A, NAFCO had expressly reserved the right to dispose of its remaining interest with or without the consent of any other members of group A.

On August 2, 1965, group B (including the Brocks) purchased from NAFCO a 20-percent interest in the Duncan property pursuant to the following agreement:

### AGREEMENT OF SALE

THIS AGREEMENT is entered into this 2nd day of August, 1965, by and among NORTH AMERICAN FINANCIAL CORPORATION, a California corporation,

hereinafter referred to as NAFCO, and DR. CLAYTON E. BROCK, DR. JEROME SIEVERS, ROBERT BROCK, and STANLEY FLEISHMAN, hereinafter referred to as Group B.

WITNESSETH:

WHEREAS, NAFCO has purchased four hundred thirty-six (436) acres, more or less, in an unincorporated area in San Bernardino County, being described in Book 6434 at page 172 in a deed running from DONALD F. DUNCAN to NAFCO recorded July 20, 1965, and

WHEREAS, Group B desires to purchase a portion of NAFCO's interest in said property.

Now, THEREFORE, in consideration of the mutual promises of the parties hereto, it is hereby agreed:

1. NAFCO acknowledges receipt of TWENTY–FIVE THOUSAND DOLLARS ($25,000.00) from Dr. Clayton E. Brock, and EIGHTEEN THOUSAND SEVEN HUNDRED FIFTY DOLLARS ($18,750.00) from Stanley Fleishman, and TWELVE THOUSAND FIVE HUNDRED DOLLARS ($12,500.00) from Dr. Jerome Sievers, and SIX THOUSAND TWO HUNDRED FIFTY DOLLARS ($6,250.00) from Robert Brock. Such sums are received by NAFCO solely as advance interest and no portion of such sums applies in any way on the principal payments due from Group B to NAFCO. Group B shall own twenty per cent (20%) of the entire project but shall make no principal payments to NAFCO for ten (10) years. This shall be apportioned eight per cent (8%) to Clayton E. Brock, six per cent (6%) to Stanley Fleishman, four per cent (4%) to Dr. Jerome Sievers, and two per cent (2%) to Robert Brock. On July 1, 1975, Group B shall pay THREE HUNDRED TEN THOUSAND AND 00/100 DOLLARS ($310,000.00) to NAFCO as full principal hereunder. Group B shall pay NAFCO SIXTY–TWO THOUSAND FIVE HUNDRED DOLLARS ($62,500.00) of interest for the period ending June 30, 1966, receipt of which is hereby acknowledged by NAFCO. For the period from July 1, 1966 to June 30, 1968, Group B shall pay NAFCO SIXTY–TWO THOUSAND FIVE HUNDRED DOLLARS ($62,500.00) in interest only, Group B shall pay NAFCO SIXTY–TWO THOUSAND FIVE HUNDRED DOLLARS ($62,500.00) of interest only from July 1, 1968, to June 30, 1970, and a like sum as interest only from July 1, 1970, to June 30, 1972, and no other interest payment shall be required from Group B. NAFCO shall make all payments of all kinds required under the Duncan Agreement but may bill Group B for such payments on July 1, 1975, in addition to the THREE HUNDRED TEN THOUSAND DOLLARS ($310,000.00) set forth above, to the extent that such payments are capital items, but NAFCO must itself bear all interest costs and taxes and non-capital items.

2. Group B agrees to be expressly bound by all of the provisions of the Agreement of Purchase dated July 13, 1965, for all purposes relating to Donald F. Duncan and his successors in interest.

3. NAFCO shall receive ten per cent (10%) of the net proceeds from the disposition of all of the property beneficially owned by Group B and covered by this agreement. Net proceeds shall be determined for each independent member of Group B by NAFCO on written request of any member of Group B. The share of gross proceeds of any member of Group B shall be charged with all costs and expenses attributable to such share and the balance, if any, shall be net proceeds as to such member.

4. NAFCO has heretofore disposed of thirty-five per cent (35%) of the Duncan contract and is hereunder disposing of twenty per cent (20%) additional and expressly reserves the right to dispose of its remaining forty-five per cent (45%)

interest hereunder without prior consultation with or the consent of the parties to this agreement.

As in the agreement with group A, NAFCO retained exclusive managerial rights to the property, and employed Plant and Margolis to perform professional services.

At this point NAFCO still retained a 45-percent interest in the Duncan property. On September 2, 1965, a third partnership was formed—group C (including Mr. and Mrs. Boro). This partnership undertook to purchase all of NAFCO's remaining interest subject to the following terms:

### AGREEMENT OF SALE

THIS AGREEMENT is entered into this 2nd day of September, 1965, by and among NORTH AMERICAN FINANCIAL CORPORATION, a California corporation, hereinafter referred to as NAFCO, and DR. HORST W. WEINBERG, MRS. SUSAN VALBERG, LEON BORO, ELAINE FISCHEL, NATHAN TORGAN, JR., DR. ROBERT F. BURAK, MRS. PAULINE SCOTT, DR. HENRY MAYER, CHARLES W. ADAMS, DR. CLAYTON E. BROCK, and TREUHAFT AND WALKER, hereinafter referred to as GROUP C, and MRS. MARIA COLE, hereinafter referred to as GUARANTOR.

### WITNESSETH:

WHEREAS, NAFCO has purchased 436 acres, more or less, in the unincorporated area in San Bernardino County being described in Book 6434 at page 172 in a deed running from Donald F. Duncan to NAFCO recorded July 20, 1965, and

WHEREAS, NAFCO has retained a forty-five per cent (45%) interest in such property and now desires to dispose of said 45% interest, and

WHEREAS, Group C desires to purchase all of said remaining 45% interest, and

WHEREAS, Guarantor's participation is required by NAFCO and Donald F. Duncan.

Now, THEREFORE, in consideration of the mutual promises of the parties hereto, it is hereby agreed:

1. Group C shall pay NAFCO as interest only hereunder the sum of ONE HUNDRED TWENTY-FIVE THOUSAND AND 00/100 DOLLARS ($125,000.-00). Nathan Torgan, Jr., shall pay NAFCO TWENTY THOUSAND DOLLARS ($20,000.00) ; Dr. Clayton E. Brock and Dr. Horst W. Weinberg, and Treuhaft and Walker shall each pay NAFCO FIFTEEN THOUSAND DOLLARS ($15,-000.00) ; Dr. Henry Mayer and Mrs. Susan Valberg and Charles W. Adams and Dr. Robert Burak shall each pay NAFCO TEN THOUSAND DOLLARS ($10,-000.00) ; Leon Boro and Miss Elaine Fischel shall each pay NAFCO SEVEN THOUSAND FIVE HUNDRED DOLLARS ($7,500.00) ; and Mrs. Pauline Scott shall pay NAFCO FIVE THOUSAND DOLLARS ($5,000.00) as the pro ration of such $125,000.00. The total $125,000.00 due hereunder shall be paid on or before August 31, 1966. No portion of any such payment shall apply in any way on the principal payments which will be due from Group C to NAFCO.

Additional payments of interest only shall be due for the period from September 1, 1966, to August 31, 1968, and from September 1, 1968, to August 31, 1970, and from September 1, 1970, to August 31, 1972, and finally from September 1, 1972, to August 31, 1974, with the total due during each such period being $125,000.00. Such total shall be pro rated among the parties in Group C exactly as the present payments have been pro rated.

2. The total of forty-five per cent (45%) being purchased from NAFCO shall consist of seven and 2/10 per cent (7.2%) for Torgan, five and 4/10 per cent (5.4%) for Treuhaft and Walker and the same for Brock and the same for Weinberg, three and 6/10 per cent (3.6%) each for Valberg, and Mayer and Burak and Adams, two and 7/10 per cent (2.7%) each for Boro and Fischel, and one and 8/10 per cent (1.8%) for Scott.

3. Group C shall make no principal payments to NAFCO for ten (10) years. On July 1, 1975, Group C shall pay SIX HUNDRED NINETY-SEVEN THOUSAND FIVE HUNDRED DOLLARS ($697,500.00) to NAFCO as full principal hereunder.

4. Guarantor has no direct relationship with any of the members of Group C but acts only to guarantee to NAFCO the full prompt performance of all obligations by Group C. In return for her guarantee, Guarantor shall receive a flat THIRTY THOUSAND DOLLARS ($30,000.00) from NAFCO. Guarantor shall have no ownership in the property that is the subject of this agreement. NAFCO may pay such $30,000.00 at any time on or before January 1, 1967, and such sum shall not be recoverable by NAFCO from Group C.

5. Group C and Guarantor agree to be expressly bound by all of the provisions of the Agreement of Purchase dated July 13, 1965, for all purposes relating to Donald F. Duncan and his successors in interest.

6. NAFCO shall receive ten per cent (10%) of the net proceeds from the disposition of all of the property beneficially owned by Group C and covered by this Agreement. Net proceeds shall be determined for each independent member of Group C by NAFCO on written request of any member of Group C. The share of gross proceeds of any member of Group C shall be charged with all costs and expenses attributable to such share and the balance, if any, shall be net proceeds to such member.

7. NAFCO shall make all payments of all kinds required under the Duncan Agreement or otherwise in connection with the property but may bill Group C for such payments on July 1, 1975, in addition to the $697,500.00 set forth above, to the extent that such payments are capital items. NAFCO must itself bear all interest costs and taxes and non-capital items including the costs paid for the guarantee.

8. NAFCO is to be the sole manager of the property. It shall receive no payment for such services. NAFCO is to retain Harold M. Plant, C.P.A., and Harry Margolis, Esq., as accountant and counsel respectively in connection with this project and will compensate them entirely and solely as its own responsibility. NAFCO will delegate its authority to Mr. Plant and Mr. Margolis and either of them may act for all of the owners of the property under this agreement. NAFCO approval in writing shall be required before any action which affects the parties of this agreement may be taken. The approval of members of Group C shall not be required for any purpose hereunder.

The guarantor in this agreement was Maria Cole who received and reported the $30,000 fee she received.

NAFCO sold and the partnerships—group A, group B, and group C, collectively known as the 10,000 Ventures—at all times intended to and did in fact acquire ownership of the Duncan property.

A few changes have occurred in the membership of the various partnerships. At the end of 1967 the Anglo Dutch Corp. (ADC) purchased NAFCO's 65-percent interest of group A for $118,214.02 which was the then balance in NAFCO's capital account. A further change

occurred when there was a divorce in the Gleitsman family. Their 5-percent interest was split evenly and the wife sold her 2.5-percent interest to ADC for $20,000.

Throughout it all group B has remained together.

At the end of 1965 group C underwent its first change when a Mrs. Roberson, an attorney practicing professionally under the name of Doris Bren Walker (the Walker in Treuhaft and Walker), took over the entire Treuhaft and Walker interest. In 1968 Supriano and Burak sold their interest to Roberson, Boro, and Fleishman for a total of $10,000 each. They had paid $15,000 each in 1965. Finally, in 1969, Weinberg, Scott, Mayer, Charles E. Adams, and Fischel all sold their interest to the remaining partners in group C. But for Mrs. Scott, a widow with a modest estate, all these individuals sold their interest for less than they had originally paid for them. None of the withdrawing partners have retained any interest of any kind in the Duncan property.

NAFCO remained a member of the group A partnership from 1965 until the end of 1967. During this time NAFCO's total contribution to group A was $330,287.50. For the same years NAFCO reported losses totaling $212,073.48. These losses reduced its capital account to $118,214.02—the sum it received upon the sale of its interest in group A to ADC. This sale was in accord with NAFCO's desire to have no dollar investment of its own in the Duncan property.

During the period of its participation in group A, NAFCO received from group B $62,500 in 1965, $31,750 in 1966, and $43,750 in 1967. During this same period NAFCO received from group C $125,000 in 1965, $70,000 in 1966, and $50,000 in 1967.

NAFCO was a subsidiary of Universal Decorating Leasing Corp. For the years 1965, 1966, and 1967 the parent company filed consolidated returns—reporting no taxable income and paying no Federal income taxes.

During 1965 and 1966 NAFCO reported as gross income those sums received from group B and group C. NAFCO also claimed its share of group A's losses for both those years. In 1967 NAFCO received, but did not report as income, payments from group B and group C totaling $93,705. During 1967 NAFCO did not report its share of group A's losses—namely, $72,934.89.

Following the acquisition of NAFCO by ADC (which took effect January 1, 1968), ADC received from group B and group C the total sum of $178,422 from 1968 through 1971 which was not reported by ADC as gross income. During the same period group A incurred large tax losses. ADC's share of these losses was $350,694.53. For the same period of time ADC claimed a loss of $219,038.33. For reasons not

shown ADC failed to claim the loss of $131,038.33 on its tax returns. Neither ADC nor NAFCO is before the Court in these proceedings.

By virtue of the Gleitsman divorce and sale back to group A of a 2.5-percent interest and the purchase by ADC of NAFCO's 65-percent interest in group A, ADC now owns 67.5 percent of group A. During the period that ADC has been a member of group A (January 1, 1968, through December 31, 1971), it has paid out a total of $548,266.08. During the same period ADC has collected from group B $28,250 in 1968, $12,500 in 1969, nothing in 1970, and $12,500 in 1971. ADC has further received from group C $52,500 in 1968, $52,000 in 1969, $15,500 in 1970, and $30,172.50 in 1971.

The disallowed losses of each partnership were as follows:

| Year | Group A | Group B | Group C |
|------|---------|---------|---------|
| 1965 | $125,229.61 | $62,500 | $125,000.00 |
| 1966 | 88,829.76 | 31,750 | 70,000.00 |
| 1967 | 112,207.54 | 43,750 | 50,000.00 |
| 1968 | 123,559.76 | 28,250 | 52,500.00 |
| 1969 | 126,083.16 | 12,500 | 52,000.00 |
| 1970 | 134,627.74 | | 15,500.00 |
| 1971 | 144,522.76 | 12,500 | 30,172.50 |
| | [Taxes, interest, misc.] | [Interest] | [Interest] |

In his notices of deficiencies respondent disallowed all of the deductions claimed by the members of the 10,000 Ventures. For these petitioners (groups A, B, and C) the total amount of the losses claimed was $745,150. However, in his opening brief, respondent recognizes $577,210 as the total of proper deductions for all the petitioners and would now disallow only $167,940 of the deductions for all petitioners. Respondent considers this difference to constitute a deposit with, or excess payments to, NAFCO, which he characterizes as the corporate middleman. The stipulation of facts shows that "group B incurred an obligation to pay NAFCO principal of $310,000 on July 1, 1975, and interest of $250,000, all prior to June 30, 1972." It also shows that "NAFCO was required to pay all taxes and other costs incurred in connection with the Duncan property, so that the total dollar cost to group B would be $560,000 free and clear on July 1, 1975." The circumstances are identical for group C; only the amounts are different. Respondent is unable to demonstrate that any of the payments made by group B or group C were deposits or excess payments.[3]

---

[3] Even if we assume respondent is correct, petitioners have shown that sec. 483 of the Code would result in such "deposits with or excess payments" being required by law to be treated as interest by group B to the extent of $280,000 (only $250,000 was claimed in the returns filed by group B) and by group C to the extent of $661,000 (only $625,000 was deducted by group C). Thus, even if all payments made by group B and group C were principal, the law itself would require those petitioners who were partners in group B and group C to have taken deductions in excess of those they claimed.

We think respondent's anguished reference to *Gregory* v. *Helvering*, 293 U.S. 465 (1935), is entirely misplaced in these circumstances. It is true that *Gregory* stands for the principle that substance prevails over form, but also that a taxpayer has the legal right "to decrease the amount of what would otherwise be his taxes, or altogether avoid them, by means which the law permits." Groups A, B, and C involved genuine risks of loss, genuine hopes for gain, genuine obligations, and real economic substance. Certainly if $577,210 is deductible, then all of the deductions are proper because for $577,210 to be deductible the relationship of the parties must have been valid.

To us the facts are perfectly clear. Group A acquired the Duncan property from NAFCO under the identical terms and conditions that applied to NAFCO's purchase of the Duncan property from Duncan. The sole exception was that NAFCO kept control of the property with its retention of a 65-percent interest in group A, and NAFCO also retained a 10-percent override in any profit earned from the Duncan property. This meant that group A was substantially indebted to Southwest and Duncan and took all of the risks of taxes and miscellaneous expenses as well as the benefits of the nominal income that the property earned. Group A paid interest and taxes under bona fide, contractual, arm's-length arrangements and reported its activities fully in partnership tax returns.

Groups B and C were not original purchasers from Duncan. Groups B and C made quite different bargains from the group A bargain. The situation of groups B and C was almost identical except for slightly different interest rates and manner of payment of interest to NAFCO, from which both purchased their participation in the Duncan property. Group B purchased 20 percent from NAFCO and group C purchased 45 percent from NAFCO.

The principal risk that groups B and C took that was different from that taken by group A involved taxes. That this was a serious risk is indicated by the fact that taxes increased from an annual cost of $17,486.49 in 1966 to an annual cost of $55,342.99 in 1971. Groups B and C did not pay taxes at all under their respective agreements with NAFCO. NAFCO did. Groups B and C had taken this gamble out of their purchase of their participation in the Duncan property, as contrasted with group A which continued to carry this gamble.

Interest rates were fixed for all of the parties at all times. Group A was guaranteed a 7-percent rate for the entire 10-year period by Duncan. Groups B and C had fixed-interest payments due within fixed periods so that a mathematical calculation of their respective interest rates is not difficult. The interest rate payable by group B is 4.465 percent and that payable by group C is 4.726 percent.

Bona fide obligations for interest and taxes were incurred by group A and were paid by group A. The payment of principal required of group A to Duncan was limited with the major principal payments delayed for 10 years. Bona fide obligations were incurred by groups B and C to NAFCO for interest, and these payments were essentially accelerated for the benefit of NAFCO, and groups B and C did pay such interest obligations. The principal payments were delayed for groups B and C for 10 years, which was to their advantage. The replacement of NAFCO by ADC has no significance.

In short, it is our view that groups A, B, and C had bona fide partnership participations in the ownership of the Duncan property, pursuant to which they made deductible payments, i.e., interest for groups A, B, and C and taxes for group A. We so hold. We do not find here an exaltation of form over substance. The good faith of petitioners is not questioned by the respondent.

Respondent cites *Lael Kovtun*, 54 T.C. 331 (1970), affd. 448 F.2d 1268 (C.A. 9, 1971), certiorari denied 405 U.S. 1016 (1972), in support of his position in the present cases. In *Kovtun* a loan commitment fee was denominated interest and a deduction claimed. This Court found that no indebtedness existed since the promised loans were never taken out. It was the total absence of a debt upon which interest could accrue that resulted in the denial of the deduction. Neither party in *Kovtun* made any argument premised on substance versus form. Rather the argument centered about "a loan that wasn't made" in order to finance "an apartment that wasn't built." That case is clearly distinguishable on its facts from the instant cases. Here groups A, B, and C each had bona fide, existing, unconditional, and enforceable obligations to pay money, and the payments of interest and taxes by group A and interest by group B and group C were payments of such existing, unconditional, bona fide, and enforceable obligations.

The respondent further argues the applicability of *Stanley C. Orrisch*, 55 T.C. 395 (1970), on appeal (C.A. 9, March 5, 1971). In *Orrisch*, depreciation deductions were improperly allocated between partners in contravention of section 704(b). There a principal purpose of the disallowance of any depreciation deduction for several years by one partner was premised on the fact that he had no further need for the deduction. At that time other deductions effectively shielded his income. In arguing here that the petitioners "should not be permitted to manipulate their loss by arbitrarily shifting their deductions forward through the internal device of payments to NAFCO or Anglo Dutch Capital Company," the respondent attempts many things. We disagree that such payments were merely "internal devices." Actual transactions involving substantial sums transpired be-

tween unrelated persons. At no time have the three groups been able to effectuate a "consolidation." Losses were not manipulated in the sense they were in the *Orrisch* case. The individual partners deducted only their share of the losses and no more. And no deductions were taken by persons who were not entitled to them.

In his reply brief respondent states that he can agree to certain propositions, namely:

(1) The individuals in groups A, B, and C own the realty.

(2) Duncan sold the land to the individuals in groups A, B, and C.

(3) The losses claimed were not capital expenditures. The sticking point is the result—deductions taken by the three separate partnerships in excess of the amount received by Duncan.

What is faulty here is that there is more than one seller since there has been more than one transaction. NAFCO bought the land from Duncan and then group A assumed this obligation in toto. While a partner in group A, NAFCO retained rights in the property which it reserved the right to dispose of. The interest was subsequently sold to group B and group C. These partnerships deducted the interest paid to NAFCO. There is nothing erroneous in this deduction nor is there any question as to its validity.

NAFCO was an independent though cooperative participant in the project. It was willing to purchase the Duncan property if it could dispose of it relatively quickly under terms satisfactory to itself. That it was able to do so makes it no less a valid transaction. Circuitous paths to a 10-percent interest in the profits to be obtained from the development and sale of a valuable tract of land are not per se illegal.

Accordingly, we conclude that the transactions were bona fide and that the claimed deductions by the petitioners were proper and allowable. It, therefore, follows that the petitioners are not liable for the additions to tax under section 6653(a).

*Decisions will be entered under Rule 50.*