ALAN B. KARME AND LAILA M. KARME, PETITIONERS v.
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3059-73.     Filed March 24, 1980.

*Harry Margolis, W. Palmer Kelly, Richard Gladstein,* and
*Maureen O'Connell,* for the petitioners.
*John E. Lahart* and *William E. Bonano,* for the respondent.

FEATHERSTON, *Judge:* This case was tried before Special Trial
Judge Lehman C. Aarons pursuant to Rule 180, Tax Court Rules
of Practice and Procedure. His report was served on the parties.
Petitioners filed exceptions, and respondent filed a brief in
response to petitioners' exceptions. After careful consideration,
the Special Trial Judge's report, which is set forth below, is
adopted with minor modifications.

### REPORT OF THE SPECIAL TRIAL JUDGE*

AARONS, *Special Trial Judge:* Respondent determined a defi-
ciency in petitioners' Federal income tax for 1969 in the amount
of $29,626 and an addition to tax of $1,481 under section 6653(a).[1]
After concession of the negligence penalty by respondent on
brief, the only issue remaining for decision is whether $60,000 is
deductible as interest in 1969.

A constitutional objection raised by petitioners has already
been disposed of. Petitioners' constitutional claim was originally
presented in the form of a motion for summary judgment. Near
the close of trial, with leave of the Court, the motion for
summary judgment was withdrawn by petitioners, who were
granted permission to embody their constitutional objection in
an amendment to their petition. The matter was disposed of
when the Court granted respondent's motion to strike the
amendment for reasons set forth in a Memorandum Sur Order
dated October 27, 1978. This memorandum is a part of the record

---

*This report is prepared pursuant to Rule 182(b), Tax Court Rules of Practice and Procedure.
[1]All section references are to the Internal Revenue Code of 1954, as in effect during the tax year in
issue, unless otherwise noted.

herein and fully sets forth the positions of the parties with respect to the constitutional issue as well as the Court's disposition of the matter.

In the opening brief in this case, filed after trial and after the Court's order striking the amendment, petitioners' counsel again raised certain arguments with respect to the motion for summary judgment and the Court's granting of respondent's motion to strike. A short response to these arguments is in order.

Petitioners' counsel requested that the motion for summary judgment be reinstated, apparently only insofar as it related to the merits of the case. They contend that if the Court accepts as true the allegations in the affidavits accompanying the original motion, judgment should be entered for petitioners on factual grounds. However, the Court specifically stated at trial that it would accept the allegations contained in the affidavits as true only for purposes of passing upon the constitutional claim and not as dispositive of any ultimate fact relating to the merits of the case. Furthermore, if we were to treat the request contained in petitioners' brief as a motion to reinstate the motion for summary judgment, it would be within the Court's discretion to deny it. We can see no purpose in considering a motion for summary judgment at this late point, after full trial on the merits of the case. Moreover, a dispute exists as to certain of petitioners' factual allegations, contained in the affidavits, which relate to the substance of the transactions involved in this case.

Counsel for petitioners also argued that the Court denied petitioners due process by striking the amendment to the petition without first holding an evidentiary hearing. As indicated in the Memorandum Sur Order, in ruling on respondent's motion to strike, the Court accepted as true (for purposes of that motion) the factual allegations contained in petitioners' amendment to petition and in Margolis' affidavit in opposition to the motion. Petitioners have alleged no new facts which would cause the Court to alter its position as set forth in the memorandum. Under these circumstances, petitioners are not entitled to an evidentiary hearing. Cf. *Cohen v. United States*, 378 F.2d 751, 760 (9th Cir. 1967), cert. denied 389 U.S. 897 (1967); Fed. R. Civ. P. 43(e).

## FINDINGS OF FACT

Some of the facts in this case have been stipulated and those facts are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by reference.

Petitioners Alan B. Karme (hereinafter petitioner) and Laila M. Karme (Laila) resided in Pasadena, Calif., when they filed their petition in this case. They filed their return for 1969 with the Internal Revenue Service Center, Ogden, Utah.

During 1969 and 1970, petitioners were husband and wife. Petitioner was a licensed physician, practicing medicine as a psychiatrist in the State of California. At the same time, Laila was concluding specialized medical studies as a licensed physician.

In October 1969, petitioners sought tax and estate planning advice from Elaine B. Fischel (Fischel), an attorney who maintained offices in southern California. On November 20, 1969, Fischel met with Harry Margolis (Margolis), an attorney with whom she was associated and who maintained offices in the San Francisco Bay area. They discussed possible tax planning ideas which could be employed by petitioners in 1969. Margolis developed a plan, explained below, which was acceptable to petitioners. Although Margolis played so significant a role in petitioners' tax affairs, petitioners did not meet him until 1972. Instead, they dealt largely with Fischel in her southern California office, and with Neil Eskind (Eskind), an associate of Fischel. The fee for the planning services of Margolis and his associates was agreed to be in toto one-third of any tax savings achieved, plus costs.

The tax plan developed by Margolis involved basically the payment of $600,000 by petitioners to World Minerals, N.V., a Netherlands Antilles corporation, for the purchase of 40,000 shares of common stock of Associated Care Enterprises (Care), a Delaware corporation operating in the health care field. Petitioners were to borrow the $600,000 from Alms, N.V., another Netherlands Antilles corporation, and to pay the first year's interest on the loan, $60,000, before the close of 1969.[2] In addition, a trust was to be established for petitioners with Aruba

---

[2] The use of such words as "payment," "purchase," "borrow," "interest," and "loan" in our findings of fact is for narrative convenience, following the form of the transaction, and is not intended to indicate any conclusion concerning the actual substance of the transactions in question.

Bonaire Curacao Trust Co., Ltd. (ABC Trust Co.), located in the Bahamas, as part of the comprehensive tax plan.

Care was incorporated in 1969 for the express purpose of combining a number of convalescent hospitals and pharmacy enterprises. It was to acquire or lease six such facilities in exchange for a total of 1 million shares of its stock and 30,000 stock purchase warrants.[3] Care also planned to make a public offering of an additional 250,000 shares of common stock at $15 per share, which would have brought the net tangible book value of each share to $4.93, up from $2.42 before the proposed public offering. The original registration statement for this public offering was submitted for the approval of the Securities and Exchange Commission in September 1969.

In April 1969, Care contracted to purchase four of these six facilities from Associated Convalescent Enterprises (Convalescent), a California corporation. (Fischel was president of Convalescent at this time and owned all of the stock of Maryelle Corp., Convalescent's parent. Margolis, who had been Convalescent's consultant and legal counsel since its inception in 1967, represented it in this matter.) As part of the consideration for the sale of the four facilities, Convalescent received 282,334 shares of unregistered Care stock. These shares were placed in escrow pending the transfer of the health care facilities to Care. Escrow agreements involving the various facilities were not closed until early 1970.

Fischel, as president of Convalescent, executed (at the instruction of Margolis) three investment letters, addressed to Care and dated October 15, 1969, which covered these unregistered shares. Each letter stated that the shares—

are being acquired by me for my own account and interest for investment and not with a view to distribution. The undersigned further agrees that he will make no resale of any of said securities unless said shares are registered with the Securities and Exchange Commission or are exempt from such registration.

If such securities are sold in an exempt transaction, I agree that such sale will not be made until I have (1) advised you of the basis of the exemption, (2) obtained an opinion of counsel, satisfactory to you, that such transfer is in conformance with the preceding paragraph and will not violate federal or state securities laws, and (3) secured and delivered to you an investment letter, similar to this, from the transferee.

---

[3]In the case of the purchase of one of the facilities, Care was to provide additional consideration in the form of cash and promissory notes.

Convalescent had previously entered into an "Agreement for Sale of Real Property," dated September 1, 1969, with World Minerals. (World Minerals was a Netherlands Antilles corporation originally organized at Margolis' request to serve as a foreign vehicle for investments of certain of his clients.) This agreement provided for the sale by World Minerals to Convalescent of certain real property underlying a portion of one of the facilities which Convalescent had contracted to convey to Care. The consideration for this sale was set at $400,000—$364,000 to be paid to World Minerals and $36,000 to be paid to Behar Corp., a creditor of World Minerals.

In spite of the terms of the October investment letters, Convalescent had also granted World Minerals, under this real property sales agreement, the right to purchase certain shares of Care stock. After stating that Convalescent expected to receive a substantial interest in Care, the agreement provided in part as follows:

ACE [Convalescent] agrees to set aside for WORLD [World Minerals] as many shares at the issue price, which is now contemplated to be $15.00 per share, as could of [sic] been purchased for $400,000.00 on the date on which the Securities and Exchange Commission of the United States of America allows the stock issue to be registered. WORLD shall have the right to purchase such block of shares at any time up to and including September 1, 1974, and may use the full balance due of $364,000.00 as payment on account of the purchase of said block of stock. WORLD shall not be required to take this action and the right of WORLD to take this action shall cease at the close of business on September 1, 1974.

Petitioner, in turn, contracted to purchase Care stock from World Minerals. Under the terms of the agreement of sale[4] which was dated November 15, 1969,[5] petitioner agreed to pay World Minerals $600,000, on or before December 31, 1969, in exchange for the right to receive 40,000 Care shares. Specifically, the agreement provided in part as follows:

World Minerals N.V. is entitled to receive in excess of 50,000[6] shares of

[4]Laila did not sign this agreement.

[5]In spite of the date on the agreement, Fischel did not even initiate discussion with petitioners of a possible purchase of Care stock until Nov. 20, 1969. In fact, although an initial draft of the agreement was made by Fischel sometime in November, the agreement was not drafted in final form until June 1970 and was not executed by petitioner until after June 15, 1970.

[6]This amount exceeds the approximately 26,666 shares which World Minerals was entitled to purchase from Convalescent under the "Agreement for the Sale of Real Property." Convalescent was obligated to World Minerals in connection with the earlier acquisition of three of the four facilities

common stock of Associated Care Enterprises, a Delaware Corporation which stock is to be offered to the public some time in the year 1970.

\*   \*   \*   \*   \*   \*   \*

World Minerals N.V. hereby transfers its right to receive 40,000 shares of common stock of Associated Care Enterprises Inc. to Alan B. Karme and will deliver or cause to be delivered the said stock within ten days of the maturity of World Minerals' right to receive said stock. World Minerals N.V. does not guarantee that the stock will be issued or that if it is issued that it will be deliverable. If the stock is not issued by 1 December, 1970 World Minerals will pay $600,000 to Alan B. Karme on that date. If the stock is issued, but World Minerals—for whatever reason—cannot deliver the stock, World Minerals N.V. will pay to Karme the market price of such stock as of 1 December 1970 (market value to be based upon the average of all sales for the last ten business days of November.)

\* \* \* The parties agree that the stock referred to in this agreement is that type of stock commonly referred to as "letter stock" and is offered and purchased on the condition that the parties understand that this type of stock is normally held for investment purposes only.

Margolis or his associates also arranged for the purchase by three other doctors, apparently from World Minerals, of a total of 95,000 of the shares of Care stock which Convalescent had received in the initial asset exchange.

Margolis, as counsel for Convalescent, was asked by Burton Gindler (Gindler), attorney for Care in the public offering, to provide information necessary for preparing and updating the registration statement. Among other things, Gindler asked if anyone would acquire a beneficial interest in the Care stock which Convalescent held so as to become a "principal" shareholder, i.e., an owner of 10 percent of the total 1,250,000 shares which would be outstanding after the proposed offering. Margolis never informed Gindler of World Minerals' right to Care stock or of the interest held by petitioner and the other three Margolis clients who intended to purchase stock. Neither was Gindler made aware of any attempt on the part of Convalescent to comply with the requirements of the investment letters (p. 1166 *supra*) in connection with the planned sale of Care stock to World Minerals or petitioner.

On December 16, 1969, petitioner borrowed $600,000 from

---

which Convalescent was to transfer to Care, and we presume that Convalescent had transferred additional Care stock or rights to Care stock in partial satisfaction of these obligations. We cannot determine from the record the exact extent of World Minerals' interest in Care.

Union Bank at 10-percent annual interest. This loan was guaranteed by Convalescent and secured by assets of Convalescent.[7] Union Bank records indicate that the purpose of the loan was to allow for the "transfer of assets to a foreign trust" and that the loan would be repaid through a "simultaneous loan against the assets by an entity of the foreign trust." A letter, dated December 12, 1969, and signed by petitioner, instructed Union Bank to charge his account $600,000 for repayment of the loan as soon as funds to cover that amount were deposited in the account.

Also, on December 16, 1969, the proceeds of the loan were deposited in petitioner's Union Bank checking account and then transferred by cable to the account of World Minerals at Banco Popular Antiliano N.V., Curacao (Banco Popular), in the Netherlands Antilles. As prearranged, the $600,000 was immediately transferred from World Minerals' account to the account of Alms.[8] (Alms was a Netherland Antilles corporation which Margolis had helped to organize and which frequently took part in transactions with Margolis' clients.) On the same day, December 16, 1969, the money was cabled back to petitioner's checking account at Union Bank. Pursuant to petitioner's instructions, his checking account was charged and his loan account was credited with a $600,000 payment on December 17, 1969.

This series of transactions was fully planned and implemented by the Margolis office. Such a technique was frequently employed by Margolis and was referred to in his office as a "money movement." Periodically, after an accumulation of

---

[7] A financial statement dated Dec. 3, 1969, and signed by both petitioner and Laila was submitted to Union Bank in connection with the loan. The statement indicates net worth of $162,400 and annual income of $145,000. Convalescent was willing to secure the loan under these circumstances apparently because of its desire to help World Minerals quickly convert the right to purchase Care stock into cash. (World Minerals had been reluctant to agree to accept the stock in satisfaction of a portion of Convalescent's obligation referred to above.)

[8] Although bank records clearly indicate that this transfer took place, no evidence was presented at trial concerning any underlying obligation of World Minerals to Alms which could have given rise to this particular step in the series of transactions. Nor was an explanation provided of Alms' function as anything other than a conduit. In general, Alms, which could loosely be described as a "financial institution," was funded by investments and loans made by Bahamian trusts. Alms loaned these funds in turn to domestic individuals and entities which had established the Bahamian trusts. Margolis testified:

"So you [a domestic entity or individual and client of Margolis] end up, if you want to shortcut it, hopefully to some extent borrowing your own money. Now very often you're not borrowing your own money. You're borrowing some other trust's money."

"transaction requests" submitted by Margolis' staff members was collated, the series of transactions in the money movement was plotted on a spread sheet. Then, an authorization form was prepared for each transaction in the money movement and signed by the attorney involved. These authorization forms usually contained information concerning what amount was involved in the transaction, who the parties were, whether money was to leave the Margolis "system" (see p. 1173 et seq.), and what the purpose of the transaction was. Finally, after the necessary bank forms (deposit slips, checks, and authorization letters) were prepared, and after the involved banks were alerted by telephone, the money movement was initiated at the appointed time. The money movement technique had the benefit of making possible a group of transactions with a total value far in excess of the actual cash involved.

The $600,000 payment from Alms to petitioner was followed by a 1-year promissory note for that amount signed by petitioner alone. The note provided that the unsecured loan was conditioned on the payment of 10-percent interest ($60,000) on or before December 31, 1969. Although the note was dated December 16, 1969, it was not executed by petitioner until after January 4, 1970.

Anglo Dutch Capital (Anglo Dutch) loaned petitioner $50,000 (at a 10-percent annual interest rate), which was paid to petitioner by a check dated December 29, 1969. (Anglo Dutch was a California corporation owned by Margolis and his employee, Walter Joe, which provided loans exclusively to clients and employees of Margolis.) Petitioner deposited these loan proceeds in his checking account and wrote a check to Alms for $60,000, which was charged to his account January 12, 1970. Although a copy of the back of this canceled check is in evidence, neither the face of the check nor any copy thereof was introduced at trial to prove its date.

In entering into this series of transactions, petitioner relied almost exclusively on the advice and assistance of his attorneys. The plan was presented to him and he accepted it. He had no role in planning or carrying out the various steps other than simply signing the required documents. The attorneys involved arranged the necessary loans and sale terms. Eskind made arrangements for the Union Bank loan and participated in obtaining the Alms loan. Margolis handled the purchase of the

Care stock and was involved as well with the Alms loan. Fischel had no discussion with either Alms or World Minerals in 1969 concerning petitioner's affairs or his participation in these transactions. Petitioner's knowledge concerning Care was derived from discussions with Fischel and Eskind. Although he was aware that risk was involved in the investment, petitioner made his decision to purchase the Care stock on the basis of this general background knowledge and with only a cursory examination, if any, of the registration statement prepared in connection with the proposed public offering of Care stock. Petitioner never inquired of the attorneys why the full $600,000 payment had to be made in advance in order to obtain a right to acquire the stock (if and when there was a subsequent public offering).

The proposed public offering of 250,000 shares of Care stock was abandoned when Carl Marks Co., the underwriter, withdrew in May 1970. The proposal was formally withdrawn by Care on July 10, 1970.

In November 1970, petitioner's $600,000 payment was refunded by World Minerals. This was accomplished through another money movement. This one involved $2,025,000, which included repayments to petitioner and the three other doctors who were also would-be investors in Care. On November 23, 1970, $2,025,000 was transferred from Alms' account at Banco Popular to the account of ABC Trust Co. (ABC Trust Co., which operated from the Bahamas, had been established years before at the suggestion of Margolis and did business with many of his clients.) Then the money, still within Banco Popular, was transferred from the account of ABC Trust Co. to that of World Minerals. Next, the $2,025,000 was transferred by cable to the accounts at Union Bank of the four doctors, including petitioner. Pursuant to petitioner's instructions, the $600,000 credited to his account was immediately cabled back to Alms on the same day, November 23, 1970, in repayment of his loan from Alms.

Throughout 1970, petitioner made the following payments of principal and interest to Anglo Dutch on the $50,000 loan: $14 interest in February; $1,250 interest and $1,250 principal in April; $30,000 principal in June; $2,500 principal in July; $1,453 principal and $1,047 interest in September; and $2,260 interest in December.

In arranging and implementing their tax planning for clients,

Margolis and his associates would often make use of "planning memoranda" which usually outlined whatever steps were to be taken and the reasons for them. Sometimes, the memoranda contained drafts of documents necessary for the transactions involved in a tax plan. One such memorandum in the instant case set forth documents which were required "to complete the records" of the negotiations concerning petitioner's purchase of Care stock. This memorandum, signed by Margolis on or about October 28, 1970 (long after it was clear that the purchase would not take place), was addressed to A. L. M. In der Reiden, vice president of World Minerals, and read in part as follows:

KARME—WORLD MINERALS MEMO

October 28, 1970

Dr. A. L. M. In der Reiden

Dear Tony:
    We require the following items.

1. *WM to Fischel:*

Miss Elaine B. Fischel                                    November 18, 1969
Attorney at Law
4055 Wilshire Boulevard, Suite 301
Los Angeles, California 90005
Dear Miss Fischel:
    Thank you for your inquiry of 8th November with the suggestion that World Minerals N.V. might be interested in disposing of the stock in Associated Care Enterprises, Inc., that it is to acquire from Associated Convalescent Enterprises. This letter is intended to outline preliminarily the present position of World Minerals N.V.
    There has been oral agreement only as to the receipt of the stock and the governmental authorities in the United States of America have not as yet permitted the public offering to be made. When the stock is issued, it will almost certainly be limited in form ("letter stock") and this requires a sophisticated investor willing to hold the stock for the long term. Any prospective investor would therefore be requested to check matters very carefully since any such investment must be classified as speculative in the extreme, and the very fact that World Minerals N.V. would be disposing of the stock is the best evidence that it does not wish to undertake such speculation.
    Our present plans call for the sale of the stock on a guaranteed public offering delivery basis prior to 1st December 1970. The minimum lot is anticipated to be 10,000 shares, and a cash price of $15 per share will be set. Since the stock will necessarily be required to be held for some time, it is contemplated that a deadline would be set for such sales on a contract basis of the second week in December of this year. All of the contingencies and uncertainties must be included in the agreement of sale so that any warranty

on the part of World Minerals N.V. will necessarily be limited to good title and delivery.

We shall welcome inquiries from any sophisticated investor under these general conditions.

Very truly yours,

WORLD MINERALS N.V.

_____

By A. L. M. IN DER REIDEN,
*Vice President*

The original and two blind copies should be sent to me for distribution.[9]

\*  \*  \*  \*  \*  \*  \*

Thank you very much

Cordially yours,

HARRY MARGOLIS

HM:ah
cc: Elaine B. Fischel
   Michael L. Donner

A verbatim copy of the letter, signed by Dr. In der Reiden, was received by Fischel sometime after the memorandum had been written. Although Fischel had written a letter of inquiry to World Minerals (dated Nov. 8, 1969, but actually drafted after Nov. 20, 1969), the letter was simply retained in her files and never sent. No such negotiations occurred in 1969 or at any time between Fischel and World Minerals, and these backdated letters represent events which had not occurred as of the time the letters were dated.

Similar circumstances surround a letter from petitioner to Fischel and Eskind dated December 5, 1969, concerning petitioner's recognition of the risk involved in the Care investment. This letter was actually written in March 1970 pursuant to a memorandum from Margolis to Fischel.

Typically, Margolis' method of tax planning involved such techniques as the use of foreign trusts as transferees in private annuities, tax haven borrowing, and back-to-back bank loans. To implement his planning, Margolis routinely employed a group of foreign and domestic corporations or other entities which were sometimes collectively referred to by his office personnel and associates as the "system." Often these individual "system

---

[9]Texts of two other letters to be sent by World Minerals were also set forth in the memorandum. These letters, relating to arrangements for repayments by World Minerals of amounts paid for the purchase of Care stock, were addressed to Fischel and Michael Donner (counsel for one of the other purchasers) and were to be dated Nov. 10 and Nov. 16, 1970, respectively.

entities" dealt primarily with clients of Margolis. Of the companies significantly involved in this case, Convalescent, Anglo Dutch, World Minerals, Alms, and ABC Trust Co. would be classified as system entities.

To a great extent, Margolis controlled the affairs of these system entities. The domestic corporations (Convalescent and Anglo Dutch) were owned outright by him or his office associates who served as officers and directors. The companies' books were kept in the Margolis office by office employees. Stationery, bank statements, checks, and deposit slips for the two corporations were kept there too.

Margolis' control over the foreign entities (World Minerals, Alms, and ABC Trust Co.) was less direct. Neither he nor any of his employees owned stock or served as officer or director in any of the foreign companies. Nevertheless, Margolis had close ties with each of them. He suggested or was involved in the organization of all three by Dr. A. A. G. Smeets, a notary in Curacao, the Netherlands Antilles, and his business associates there. Dr. Smeets' office, through certain management and trust companies, provided management services, officers, and directors for over a hundred corporations located in Curacao and elsewhere, among them World Minerals, Alms, and ABC Trust Co. (Dr. In der Reiden, for example, vice president of World Minerals, was an employee of Dr. Smeets.) The Smeets management office periodically provided Margolis with copies of bank statements and other records of Alms and World Minerals. Margolis had a very close relationship with the Smeets office. He knew most of the employees personally and had by far the largest number of clients with ABC Trust Co. Although Margolis had no legal control over the Smeets management office or the foreign system entities, Dr. Smeets and his associates were very receptive to Margolis' suggestions and requests. Margolis effectively controlled the affairs of World Minerals, Alms, and ABC Trust Co. and their transactions with petitioner.

In order to keep track of a client's affairs, Margolis or his associates would make use of what was called a "system accounting." On a worksheet with columns labeled "debit" and "credit," transactions carried out by the Margolis office on behalf of a particular client (or a related entity such as a trust) would be noted, whether the transactions involved a system

entity or some outside party. A transaction in which funds flowed from a client to a system entity would be entered as a credit. If a system entity made a payment to a client, or to an outside party on a client's behalf, the amount would be entered as a debit. Credits were netted against debits to arrive at a system balance.[10] The exact form of a "system accounting" would vary depending on who prepared it, and no strict accounting rules were followed in keeping these records. For example, while some entries were made using the cash method, other items on the same accounting, such as attorneys' fees, might be entered when accrued. In addition, transactions involving a client directly would be recorded along with trust transactions which had no obviously direct effect on the client.

The Karme Trust had been established in December 1969, at ABC Trust Co. in the Bahamas, pursuant to the overall tax plan designed by Fischel, Eskind, and Margolis. Petitioner's father, grantor of the trust, provided an initial corpus of $367, and petitioner, Laila, and their children were among the beneficiaries. In January 1970, Ocean Enterprises, a Canadian corporation in which petitioner's father had an interest, made a $30,000 loan to the trustee, ABC Trust Co., for the benefit of the Karme Trust. In the same month, the trustee advanced $40,000 to a Los Angeles office of White Weld, a stockbroker, to open an account for the trust. On June 8, 1970, the day on which petitioner made a $30,000 payment of principal on the Anglo Dutch loan, ABC Trust Co. repaid the $30,000 loan to Ocean Enterprises. These trust transactions and the other transactions described above are set forth on the Karme system accountings, which treat these items (together with certain fees and costs) as follows: [11]

---

[10]This system balance constitutes at least some indication of a client's net position with reference to all the system entities collectively. Usually, at least a portion of a system balance in favor of a client was made available, through ABC Trust Co., for investments for the benefit of the client or his trust. And in the case of at least one client, the balance was used as the basis for computing interest due the system or the client, depending on who held the net creditor position. Typically, if a client had a negative system balance, a money movement transaction involving the flow of system funds to an outside entity was not permitted without the authorization of Margolis.

[11]At least two system accountings were prepared for petitioner and the Karme Trust—one by Fischel and one by Margolis or someone in his office. Because these accountings are not identical in every respect, the figures set forth here represent a synthesis of the two which varies from each slightly. Not included in this synthesis are certain entries which were not explained at trial. Because of these variations and omissions, no balance column is shown with these figures, although the balance was frequently computed on Fischel's accounting. Margolis' accounting also showed a balance, which appeared at the bottom of the page.

| 1969 | Description | Debit | Credit |
|------|-------------|-------|--------|
| 12/15 | Karme's father to ABC—initial corpus of trust | | $367 |
| 12/16 | Karme to World Minerals—Care stock purchase | | 600,000 |
| 12/16 | Loan from Alms to Karme | $600,000 | |
| 12/31 | Loan from Anglo Dutch to Karme | 50,000 | |
| 12/31 | Karme to Alms—interest | | 60,000 |
| 12/31 | 1969 costs | 5,085 | |
| 12/31 | 1969 fees | 10,151 | |
| **1970** | | | |
| 1/12 | ABC to White Weld—open account for Karme Trust | | 40,000 |
| 1/21 | Loan from Ocean Enterprises to ABC for Karme Trust | | 30,000 |
| 1/30 | 1970 annual trust fee | 500 | |
| 2/20 | Karme to Anglo Dutch—interest | | 14 |
| 4/30 | Karme to Fischel and Eskind—fees | | 1,273 |
| 4/30 | Karme to Anglo Dutch—principal | | 1,250 |
| 4/30 | Karme to Anglo Dutch—interest | | 1,250 |
| 6/8 | ABC to Ocean Enterprises—principal | 30,000 | |
| 6/8 | Karme to Anglo Dutch—principal | | 30,000 |
| 6/30 | Karme to Fischel and Eskind—fees | | 1,273 |
| 7/6 | Karme to Anglo Dutch—principal | | 2,500 |
| 9/29 | Karme to Anglo Dutch—principal | | 1,453 |
| 9/29 | Karme to Anglo Dutch—interest | | 1,047 |
| 9/30 | Karme to Fischel and Eskind—fees | | 1,273 |
| 11/23 | World Minerals to Karme—refund on Care stock | 600,000 | |
| 11/23 | Karme to Alms—principal | | 600,000 |
| 12/11 | Karme to Anglo Dutch—interest | | 2,260 |

On their Federal income tax return for 1969, petitioners treated the $60,000 paid to Alms as a deductible interest payment. Respondent disallowed the deduction in his statutory notice of deficiency on the ground, inter alia, that petitioners failed to show that the transaction should be recognized for tax purposes. In his post-trial briefs, respondent contends that the facts indicate that the loan from Alms to petitioner was a sham because the $600,000 transfer from Alms did not create an indebtedness, because the purchase of Care stock from World Minerals was without substance, and because the $60,000 payment to Alms was a system transaction which resulted in no change in petitioners' financial position. Petitioners, on the other hand, contend that the substance of the transaction comports

with its form, that petitioners incurred a valid indebtedness, and that they paid $60,000 interest on that indebtedness in 1969.

## OPINION

At trial, petitioners' counsel moved to strike substantial portions of the testimony of all but one of respondent's witnesses and objected to the introduction of certain documents as well. Because testimony was heard out of logical order (for the convenience of the witnesses and parties), the Court reserved its final rulings on these motions and objections. Petitioners reiterate on brief the motions and objections, which are set forth in summary form below, in a single motion to strike.

Although Doxie Gore, a bookkeeper employed by Margolis since 1969, was originally called by petitioners, respondent subsequently made her his own witness. On direct examination by respondent, she testified concerning system accountings, the authorization form used in connection with money movements, and accounting practices of Anglo Dutch. Petitioners move to strike her testimony on relevancy grounds.[12]

Alfred Harris, a certified public accountant, was employed by Margolis beginning in 1970. During his employment with Margolis, he was involved with managing ABC Trust Co. and preparing trust and system accountings. He testified generally about the Margolis system, money movements, and system accountings. Petitioners move that his testimony be stricken as irrelevant, since he had no specific knowledge of petitioners or the transactions in question.

The testimony of Gindler, who represented Care in the proposed public offering, provided background information concerning Care's acquisition of four health care facilities from Convalescent and preparation for the public offering. Petitioners contend that the testimony is irrelevant to the $60,000 interest deduction at issue and move that the Court strike Gindler's testimony.

Sheldon Lewis, a certified public accountant, had an independent business relationship with Margolis between 1961 and

---

[12]Although Mrs. Gore's testimony concerning system accountings was not specifically covered in the motion to strike, as framed either at trial or on brief, since petitioners' counsel did raise a relevance objection to the testimony at trial (which was overruled), and since her testimony on system accountings is characterized in petitioners' brief as irrelevant, we will treat petitioners' motion to strike as encompassing this portion of Mrs. Gore's direct testimony also.

September 1969. The two shared certain mutual clients and had periodic contact with each other (every 2 weeks, on the average) during this time. Lewis testified generally concerning the system, planning memoranda, and system accountings. Petitioners' motion to strike his testimony is based upon the witness' admission that his business relationship with Margolis was terminated before the transactions at issue took place and that he has no specific knowledge of petitioners, Alms, Convalescent, or any of the transactions involved herein.

Susan Gilbert, an accountant in the Margolis office for over a year (beginning in 1971), testified generally concerning the daily operation of the Margolis office and the system, including money movements and system accountings. Petitioners object that she was not employed by Margolis when the transactions at issue took place and that she has no specific knowledge of the petitioners and their business affairs. Petitioners move to strike her testimony as irrelevant.

James Lynch, a special agent of the Internal Revenue Service Intelligence Division, Office of International Relations, testified that he traveled to the Netherlands Antilles in November 1974 to obtain copies of certain records of Banco Popular as part of a tax investigation of Margolis. Lynch's testimony reveals that he examined and microfilmed the bank records of ABC Trust Co., World Minerals, and Alms, among others, which had been furnished by Netherlands Antilles' tax officials pursuant to a tax treaty between the United States and the Netherlands. Included in these documents were records of the transactions involved herein among petitioners, Alms, World Minerals, and ABC Trust Co. The microfilm was sent via airfreight to Nancy Reller, another IRS special agent, who had "hard copies" of it printed. Petitioners move to strike from the record (on the grounds of authenticity, hearsay, and relevance), the microfilm, the "hard copies,"[13] and the photocopies of individual documents which relate to petitioners' transactions. They also contend that in the light of IRS involvement in the "briefcase caper" described in *United States v. Payner*, 434 F. Supp. 113 (N.D. Ohio 1977), there is a taint on all evidence obtained from foreign officials by agents of United States enforcement agencies (such

---

[13]Petitioners fail to restate on brief their objection to admission of the "hard copies." However, we assume that they wish to maintain the objection stated at trial.

as the microfilmed documents herein). In addition, petitioners move that the testimony of both Lynch and Reller be stricken as irrelevant and unrelated to petitioner.

Petitioners, on brief, renew their motion that the Karme system accounting prepared by Fischel and related testimony be stricken as inadmissible under the attorney-client privilege. We will treat this motion as applying as well to the accounting prepared by the Margolis office which was also objected to at trial.

Finally, at trial, petitioners' counsel objected to the introduction of the planning memorandum because of insufficient foundation. Although he specifically stated at trial that the objection was not based on attorney-client privilege, on brief, he abandons the foundation objection and asserts that the memorandum, together with Fischel's testimony about it, should be stricken as privileged.

Rule 401 of the Federal Rules of Evidence provides the following definition of relevant evidence:

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Petitioners challenge as irrelevant the testimony concerning the operational practices of the Margolis office and the Margolis system—its money movements, system accountings, accounting practices, and planning memoranda—as well as background information on Care's acquisition of health care facilities and on the proposed public offering. Such testimony is relevant to the Court's determination of the true substance of the stock sale and interest payment and aids in our evaluation of respondent's contention that the transactions were a sham. This is true even where a particular witness had no knowledge of the specific transactions involving petitioners but could testify concerning customary office procedures based on experience with Margolis in other transactions. On this subject, rule 406 of the Federal Rules of Evidence states:

Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

Accordingly, petitioners' motion to strike the testimony of witnesses Gore, Harris, Gindler, Lewis, and Gilbert is denied.

Petitioners raise four objections to the various copies of the microfilmed Banco Popular records. The first of these is that the records were not adequately authenticated at trial, since no testimony of a bank officer or Government official was presented. With respect to authentication, rule 901 of the Federal Rules of Evidence provides as follows:

(a) General provision. The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

(b) Illustrations. By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:

*   *   *   *   *   *   *

(4) Distinctive characteristics and the like. Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances.

We find that the distinctive characteristics of the documents in question, together with circumstances, provide sufficient evidence to indicate that the documents are in fact records of Banco Popular. A cover letter under the letterhead of the Curacao office of the Netherlands Antilles Inspectorate of Taxation states that the documents are records obtained from the Gaito branch of Banco Popular. Among them are letters from Alms and World Minerals to Banco Popular concerning banking transactions about which petitioners have introduced consistent testimony. Also included in the microfilmed documents are numerous copies of a bookkeeping form. Each copy, which contains columns for debits and credits, an account name, and a short description of the transaction (including source or destination of the transferred funds), clearly relates to a transaction described in other testimony. These distinctive characteristics, in conjunction with Lynch's description of the acquisition of the records and their consistency with the rest of the evidence, satisfy the authentication requirements of rule 901.

The second objection to the Banco Popular records raised by petitioners is based on the hearsay rules. Petitioners point out that they were never provided an opportunity to cross-examine the Banco Popular employees who prepared the records. Rule

803(24), Federal Rules of Evidence, provides exceptions to the rule of exclusion of hearsay evidence—

(24) Other exceptions. A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trust worthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.

(See also rule 804(b)(5), which applies where the declarant is unavailable.)

We conclude that the bank records have equivalent circumstantial guarantees of trustworthiness and are admissible under the exception set forth in rule 803(24). They were offered as evidence of the individual transactions, which were integral steps in the money movements, and as evidence of the circular nature of the money movements themselves. More probative evidence is not available since Alms, World Minerals, and ABC Trust Co. are foreign entities not subject to process of this Court. Petitioners received notice of respondent's intention to offer the records, as required by rule 803(24), through their inclusion in respondent's proposed stipulation of facts on January 31, 1978. Finally, admission of these bank documents serves the purposes of the Federal Rules of Evidence[14] and the interests of justice. The documents are necessary to permit a full and fair examination of the transactions involved in this case and to penetrate beyond form to the underlying substance of the transactions.

Petitioners' contention that the bank records are not relevant is without merit. The documents tend to prove the circular nature and specifics of the money movements, facts which are of

---

[14]The purpose of the Federal Rules of Evidence is stated as follows in rule 102:

"These rules shall be construed to secure fairness in administration, elimination of unjustifiable expense and delay, and promotion of growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined."

consequence in determining the legal substance of the transactions at issue. (See rule 401 and discussion at p. 1179 *supra*.)

Finally, petitioners assert that the Banco Popular records are tainted because the circumstances under which they were obtained are similar to those in *United States v. Payner, supra.* However, beyond the fact that both this case and *Payner* involved the acquisition by IRS agents of documentary evidence in a foreign country, there is no similarity at all. The records herein were obtained from Netherlands Antilles Government officials pursuant to a tax treaty, not by unlawful subterfuge. Petitioners made no specific allegation of theft or impropriety in connection with respondent's acquisition of the records in this case, and we, therefore, reject their analogy to *Payner* as inapposite.

In addition, we reject petitioners' argument that the testimony of Lynch and Reller should be stricken as irrelevant and unrelated to petitioners. These witnesses were called by respondent to provide a chain-of-custody foundation for the introduction of the microfilmed records of Banco Popular. For this purpose, their testimony is relevant.

Petitioners contend that the Karme system accountings are protected by the attorney-client privilege and should be stricken from the record herein. A similar contention involving certain system accountings (including the one at issue here which was prepared for petitioners by Fischel) was raised in an earlier criminal prosecution of Margolis and was determined by the Ninth Circuit to be unfounded. *Matter of Fischel*, 557 F.2d 209 (9th Cir. 1977). We come to the same conclusion.[15]

Wigmore phrases his general statement of the attorney-client privilege as follows:

(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived. [8 J. Wigmore, Evidence, sec. 2292 at 554 (J. McNaughton rev. 1961).]

---

[15]At trial, petitioners' counsel seemed to argue that the fact that none of Fischel's clients were a party in the Margolis criminal prosecution was important to the decision in *Matter of Fischel*, 557 F.2d 209 (9th Cir. 1977), and that, because the clients asserting the privilege are petitioners in this case, a different result is required. After careful examination of the Ninth Circuit's opinion, we can find no basis for counsel's interpretation.

This definition of the privilege has frequently been relied on by other courts. See, e.g., *United States v. Goldfarb*, 328 F.2d 280 (6th Cir. 1964). Although Wigmore's formulation limits the privilege to communications made in confidence by the client, it is generally extended to advice, given by the attorney to the client, which effectively reveals the client's confidential communication. (8 J. Wigmore, sec. 2320 at 628.) Nevertheless, the privilege does not provide a blanket of secrecy over all of a client's affairs in which an attorney is involved. *United States v. Goldfarb, supra.* It does not apply, for example, to information received by an attorney from third parties. (8 J. Wigmore, sec. 2317 at 618.) Nor does it apply to communications in connection with an attorney's business advice to a client. *Olender v. United States*, 210 F.2d 795, 806 (9th Cir. 1954).

The system accountings in question contain brief descriptions of certain financial transactions and the amounts involved. Aside from attorneys' fees,[16] the transactions listed were entered into by petitioners, petitioner's father, or the Karme trust (or by Margolis or Fischel on their behalf) with third parties. These transactions were designed to put into effect Margolis' tax planning for petitioners. The system accountings are not reports to petitioners or statements of Margolis' or Fischel's tax advice. Neither are they summaries of petitioners' confidential communications. Because the accountings contain information received by petitioners' attorneys from third parties, and because petitioners have failed to show that any portion of the system accountings reveals, directly or indirectly, their own confidential communication (see *Matter of Fischel, supra* at 212), we hold that the system accountings are not covered by the attorney-client privilege.

Even if we were to decide that the attorney-client privilege applies to these accountings, we believe for several reasons that the privilege has been waived. First, petitioner testified on his own behalf as to the Alms loan and interest payment, the Care stock purchase, and other transactions which appear on the system accountings. By opening the door to testimony on certain of these transactions (and thereby allowing whatever surmise is possible from the transactions as to confidential communica-

---

[16]With exceptions not applicable here, information concerning attorneys' fees is not privileged. *United States v. Hodge and Zweig*, 548 F.2d 1347, 1353 (9th Cir. 1977).

tion), petitioners waive any claim of privilege they might have with respect to information on other transactions also recorded on the system accountings.

Secondly, by calling one's attorney to testify concerning facts learned through the employment relationship (as distinguished from facts learned casually as an ordinary witness), a client waives the attorney-client privilege. 8 J. Wigmore, sec. 2327 at 637; McCormick, Evidence, sec. 93 at 195 (2d ed. 1972). Both Fischel and Margolis testified as petitioners' witnesses. Fischel related a full account of her early discussions with petitioners (including some of the tax advice she gave) and a number of the transactions they entered into. Margolis' testimony, while dealing largely with the operation of the system, also revealed certain information about petitioners' tax plan and investments which he obviously learned through the attorney-client relationship.

Finally, in this particular case, we believe that by taking the affirmative step of petitioning this Court for a redetermination of respondent's finding of deficiency, petitioners have waived the privilege. By challenging respondent's determination that in substance petitioners did not make an interest payment, petitioners thereby put the substance of these transactions (including all the underlying facts which petitioners claim are protected) in issue. In *Hearn v. Rhay*, 68 F.R.D. 574, 581 (E.D. Wash. 1975), the court analyzed the cases in which a waiver of the privilege has been found—

in each instance, the party asserting the privilege placed information protected by it in issue through some affirmative act for his own benefit, and to allow the privilege to protect against disclosure of such information would have been manifestly unfair to the opposing party. The factors common to each exception may be summarized as follows: (1) assertion of the privilege was a result of some affirmative act, such as filing suit, by the asserting party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) application of the privilege would have denied the opposing party access to information vital to his defense. Thus, where these three conditions exist, a court should find that the party asserting a privilege has impliedly waived it through his own affirmative conduct.

As to petitioners' objection to admission of the planning memorandum, we have stated above our determination of its relevance. Because the memorandum consists of communications to a third party relating to petitioners' (and another

client's) investments, this exhibit falls outside the protection of the attorney-client privilege.

Looking at this series of objections in broader perspective, we note that petitioners would restrict the Court to a view of only a narrow segment of a complete circle of integrated transactions. The economic substance of that segment cannot be evaluated without an examination of the full circle. Having parted the curtains to permit a glimpse of the narrow segment, petitioners may not validly object to opening them all the way and affording the Court a view of the segment in its context as part of the full circle.

For the reasons stated above, we deny petitioners' motion to strike certain testimony and exhibits.

The sole remaining issue in this case is whether petitioners are entitled to an interest deduction for a $60,000 payment to Alms.

Section 163(a) provides for the deduction of "all interest paid or accrued within the taxable year on indebtedness." "Interest" means compensation paid for the use of borrowed money. *Old Colony R. Co. v. Commissioner*, 284 U.S. 552, 560 (1932); *Deputy v. du Pont*, 308 U.S. 488, 498 (1940). "Indebtedness" has been defined as "an unconditional and legally enforceable obligation for the payment of money." *Autenreith v. Commissioner*, 115 F.2d 856, 858 (3d Cir. 1940), affg. 41 B.T.A. 319 (1940).

Of course, in order to be deductible, interest must be paid on genuine indebtedness (*Knetsch v. United States*, 364 U.S. 361 (1960)), indebtedness in substance and not merely in form. As the Court said in *Golsen v. Commissioner*, 54 T.C. 742, 754 (1970), affd. 445 F.2d 985 (10th Cir. 1971):

It has repeatedly been held that the substance of a transaction rather than the form in which it is cast is determinative of tax consequences unless it appears from an examination of the statute and its purpose that form was intended to govern. The following represent merely a random selection from a wide variety of such cases that are too numerous for comprehensive listing: *Commissioner v. P.G. Lake, Inc.*, 356 U.S. 260, 265–267; *Commissioner v. Court Holding Co.*, 324 U.S. 331, 334; *Griffiths v. Helvering*, 308 U.S. 355; *Higgins v. Smith*, 308 U.S. 473; *Minnesota Tea Co. v. Helvering*, 302 U.S. 609; *Gregory v. Helvering*, 293 U.S. 465; *Weller v. Commissioner*, 270 F.2d 294 (C.A. 3), affirming 31 T.C. 33 and *W. Stuart Emmons*, 31 T.C. 26; *William R. Lovett*, 37 T.C. 317. * * *

After careful consideration of all the facts in this case, we conclude that the transfer of $600,000 from Alms to petitioner did not create a genuine indebtness. Although no single fact is

determinative of this conclusion, numerous factors taken collectively demonstrate that the Alms "loan," together with the stock "purchase" with which it was inextricably connected, was a sham.

The terms and circumstances of the Alms "loan," in themselves, raise the suspicion of a sham transaction. While petitioner was able to secure a genuine 2-day loan of $600,000 at 10-percent interest from Union Bank, that loan was fully secured by Convalescent. The Alms "loan," on the other hand, was unsecured, and although Laila was a licensed physician, only petitioner was obligated on the note. In addition, the "loan" proceeds were invested in a speculative stock venture. We doubt that any financial institution would enter into a $600,000 loan transaction at arm's length under such circumstances, especially in view of petitioners' joint net worth of $162,400.

When the transfer of $600,000 from Alms to petitioner is viewed as a part of the entire money movement transaction,[17] it becomes apparent that Alms was not a true lender but was a mere conduit in the circulation of the Union Bank loan proceeds back to petitioner and Union Bank. Putting aside for the moment a discussion of the genuineness of petitioner's payment to World Minerals, we believe that no purpose, from anyone's standpoint, has been shown for the transfer of the $600,000 from World Minerals back to Alms. There is no reason to presume that the World Minerals-Alms transaction was conducted at arm's length since both entities were effectively controlled by Margolis. Cf. *Shapiro v. Commissioner*, 40 T.C. 34, 39 (1963).[18] Although the payment from Alms to petitioner was designed to appear to be a loan, its main effect was simply to complete the circuit so

---

[17]During a period of less than 48 hours, on Dec. 16 and 17, 1969, the $600,000 moved (1) from Union Bank to petitioner's checking account in that bank; (2) to World Minerals' account at Banco Popular; (3) to Alms' account at Banco Popular; (4) to petitioner's account at Union Bank; and (5) back to Union Bank to repay its loan.

[18]In fact, a presumption to the contrary may well exist. Before the second trial session of this case, respondent requested that petitioner produce the authorization forms prepared by the Margolis office in connection with the December 1969 and November 1970 money movements. Petitioners' counsel indicated that these forms would be made available if they could be located. Although these documents would have indicated the reason (if any) for the World Minerals-Alms transfer, despite respondent's repeated requests, the documents have not been provided to the Court. Neither has petitioners' counsel unequivocally stated that they did not exist. Where a party fails to produce a document within his possession which his opponent contends is probative, a presumption arises that if produced, the document would be unfavorable. *Wichita Terminal Elevator Co. v. Commissioner*, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947); 2 J. Wigmore, Evidence, sec. 291 at 180 (J. McNaughton rev. 1961).

that petitioner could repay the Union Bank loan. The November 1970 money movement,[19] which included the "refund" of the stock purchase payment and the "repayment" of the Alms "loan," was merely the same circuit in reverse, except for the additional participation of ABC Trust Co. Again, petitioner has shown no purpose for the transfer from Alms to ABC Trust Co. or from ABC to World Minerals.

The facts in *Elbert v. Commissioner*, 45 B.T.A. 685 (1941), are analogous to those here. In *Elbert*, the petitioner created a trust with a corpus of $300,000 for her daughter. Three days later, as prearranged, the trustees gave petitioner a check for $298,000 in exchange for her unsecured demand note at 6-percent interest. (No date was fixed for payment of principal or interest.) The Court ruled that petitioner was not entitled to a deduction for interest paid to the trust on the note. "The trust was merely a convenient conduit, and petitioner in effect is claiming a deduction for interest on money 'loaned' to herself." *Elbert v. Commissioner, supra* at 690. Likewise, petitioner herein seeks to deduct interest paid on the loan to himself of his own money which he had previously borrowed from Union Bank. Although the facts of the instant case are not identical to those in *Elbert*, we believe them sufficiently similar so that the holding in *Elbert* should be applied here.

The instant case is markedly similar to *Estate of Franklin v. Commissioner*, 544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975). At issue in *Estate of Franklin* was the deductibility of interest and depreciation claimed with respect to certain property "purchased" by a limited partnership. Under the terms of a "sales agreement," the sellers had agreed to "sell" the property to the partnership for $1,224,000. This nonrecourse obligation was to be satisfied over a period of 10 years by immediate payment of $75,000 "prepaid interest," by principal and interest payments totaling roughly $9,000 per month, and by a balloon payment of the remaining purchase price (predicted to be $975,000) at the end of 10 years. The sale was combined with a net lease of the property back to the sellers for approximately

---

[19]When the stock purchase was canceled and Alms was "repaid," the $600,000, along with other funds, moved as follows on Nov. 23, 1970: (1) From Alms' account at Banco Popular to ABC Trust's account at Banco Popular; (2) to World Minerals' account at Banco Popular; (3) to petitioner's account at Union Bank; and (4) back to Alms' account at Banco Popular. The record does not disclose why the movement began with Alms, the holder of petitioner's $600,000 note, rather than World Minerals, the purported seller of the Care stock.

$9,000 per month. Except for the $75,000 prepayment, no cash was to cross between the sellers and the partnership until the balloon payment. The sellers retained many of the benefits and burdens of ownership, including responsibility for all the typical expenses of owning the property, such as utilities and taxes.

This Court, emphasizing that the partnership had the power at the end of 10 years to walk away from the transaction and merely lose its $75,000 in "prepaid interest," held that the transaction more nearly resembled an option than a sale. The Court found support for its conclusion in the absence of risk to the partnership and in the nice balance between rental and purchase payments. The Ninth Circuit, however, felt that a genuine indebtedness could exist on the facts set out above. Nevertheless, the Court of Appeals found fatal to the taxpayer's case in *Estate of Franklin* his failure to prove that the purchase price of the property was at least approximately equivalent to its fair market value. Because of this discrepancy between the purchase price and a demonstrably reasonable estimate of the fair market value, the partnership's monthly payments gave rise to no equity in the property as long as the unpaid balance of the purchase price exceeded the fair market value. The court noted (*Estate of Franklin v. Commissioner*, 544 F.2d at 1048):

Under these circumstances the purchaser by abandoning the transaction can lose no more than a mere chance to acquire an equity in the future should the value of the acquired property increase. While this chance undoubtedly influenced the Tax Court's determination that the transaction before us constitutes an option, we need only point out that its existence fails to supply the substance necessary to justify treating the transaction as a sale *ab initio.* * * *

As to the interest deduction, the Ninth Circuit stated that although interest on a debt without personal liability could be deductible, such is not the case where it appears that (*Estate of Franklin v. Commissioner, supra* at 1049) "the debt has economic significance only if the property substantially appreciates in value prior to the date at which a very large portion of the purchase price is to be discharged."

Although on paper petitioner herein had a personal obligation to pay Alms $600,000 on December 16, 1970, as in *Estate of Franklin*, there was no such liability in fact. The $600,000 payment from Alms to petitioner, as part of the December 1969 circular series of transactions, was merely a vehicle for the

return to petitioner of the $600,000 he had borrowed from Union Bank. At no time after the money movement was petitioner out of pocket $600,000 or even at risk for that amount. Under the terms of his agreement with World Minerals, set forth in pertinent part above, if the stock was not delivered to petitioner by December 1, 1970, World Minerals would refund his payment, in time for him to repay Alms before December 16, 1970. Actually, then, petitioner's liability was contingent upon the delivery of the stock. Only after delivery was there a possibility that he would have to come up with the $600,000 himself to pay Alms. Before that time, there was not a genuine debt obligation but only a chance that one would arise. As the Ninth Circuit wrote in *Estate of Franklin v. Commissioner, supra* at 1049: "This is not enough to justify an interest deduction. To justify the deduction the debt must exist; potential existence will not do."

In addition, as in *Estate of Franklin*, we are wholly unconvinced that $600,000 was a reasonable estimate of the fair market value of the stock right which petitioner acquired. The agreement between World Minerals and petitioner provided for the transfer to petitioner by World Minerals of the right to 40,000 shares of Care common stock. The consideration recited for the transfer was $15 per share (the anticipated price of the proposed public offering of 250,000 additional shares of Care common stock), to be paid by December 31, 1969. World Minerals had acquired its right to the shares under a previous agreement with Convalescent. The stock which was the subject of the right had been issued originally to Convalescent and was not registered with the Securities and Exchange Commission. (The fact that it was unregistered was noted in the agreement between World Minerals and petitioner.) Since the World Minerals-Convalescent agreement provided that the price would be whatever price was fixed for the public offering, World Minerals could not acquire the stock until after the public offering. Although the deal's contingency on the public offering was not revealed in the agreement between petitioner and World Minerals, since World Minerals merely transferred what stock right it had, this same limitation applied to petitioner.

These facts indicate several reasons for our belief that what petitioner purchased—a mere right to acquire stock if and when a public offering was made—was worth substantially less than

the $600,000 he paid for it. Although he "paid" in full in advance, petitioner had no guarantee that the stock would ever be delivered, or that the public offering price (if the stock was ever offered to the public) would be as high as $15. Furthermore, it is not apparent that the stock which petitioner was to acquire was part of the 250,000 shares which were to be sold publicly, and it is far from clear from his agreement with World Minerals that it was to be registered by the time petitioner received it. (Unregistered or restricted shares are commonly priced at a substantial discount below registered shares of the same stock, which can be publicly traded without restriction.) Finally, Margolis himself testified that even at the time of petitioner's "purchase" he had believed that the $15 offering price for the registered public offering stock was unreasonably high.

Petitioner has failed to prove that the price he "paid" was anywhere close to the value of his amorphous right to stock, of whatever kind. This defect in proof, which was held "fatal" by the Ninth Circuit in *Estate of Franklin*, is lethal under the totality of facts in petitioner's case. The fair value of such a mere right, in the market place, has to be but a small fraction of the purchase price of the registered public offering stock. The gross discrepancy between the purported indebtedness and the economic benefit flowing to petitioner is strongly persuasive that the form of the transaction did not reflect economic substance. See *Thompson v. Commissioner*, 66 T.C. 1024, 1052 (1976).

Petitioner's stock "purchase" was an integral part of the "loan" transaction; without it, there would have been no need for a loan. Moreover, the funds "paid" to the "seller," World Minerals, were immediately transferred to the "lender," Alms. We believe that the "purchase" (and, therefore, the $600,000 payment to World Minerals) was without substance. This lack of substance in the "purchase" reflects, because of their close connection, on the loan itself. Beside the disparity between the market value of petitioner's stock right and the price paid for it, an indication of lack of genuineness of the "purchase" is the premature date of the agreement. If petitioner had waited until the public offering, he could have purchased *registered* shares at the same price without incurring the burden of prepayment. Because acquisition of the stock by World Minerals (and therefore, petitioner) was contingent on the public offering,

petitioner could not in any event have acquired the Care stock from World Minerals before the public offering.

Our conclusion is bolstered by petitioner's failure to research thoroughly the company in which he made an "investment" of $600,000, far exceeding his net worth. Although petitioner had access to a copy of the Care public offering registration statement, which contained detailed information concerning Care's finances and business history and prospects, he made no careful examination of the document. Instead, petitioner followed the advice of Fischel and Margolis (by way of Fischel) who, as Convalescent's president and counsel, respectively, were far from disinterested parties. They were eager to find a "buyer" for the Care stock which World Minerals had contracted to acquire from Convalescent so that Convalescent might reduce its indebtedness to World Minerals. Although petitioner was a new client of Fischel and her associates, petitioner nevertheless relied entirely on information and recommendations provided by his attorneys, whose interest corresponded closely with those of World Minerals, the seller. He never even asked why payment had to be in advance. In the light of this reliance, petitioner's decision to make an investment is especially perplexing when one considers Margolis' testimony that he thought the proposed $15 public offering price was too high.

Other factors in the totality of facts in this record further support the conclusion that the loan transaction was a sham. Key documents were not executed, and sometimes not even written in final form, until long after their purported dates. For example, the agreement between petitioner and World Minerals was dated November 15, 1969, although Fischel never even discussed with petitioners a possible investment in Care until after November 20, 1969. The agreement was not actually drafted in final form until June 1970, and petitioner executed it sometime after June 15, 1970. By that time, the underwriter had withdrawn from the public offering, and it was clear that no Care stock would be delivered to petitioner. Other documents were backdated. In one instance, Margolis sent a planning memorandum which contained a letter, drafted nearly a year after the purported date, with the purpose of documenting negotiations which never took place. Another example is a letter signed by petitioner concerning his recognition of the risk involved in the Care investment. The letter was actually written

nearly 3 months after the purported date, pursuant to a memorandum from Margolis to Fischel.

Inconsistencies existed in the terms of the documents as well. Thus, after contracting to sell certain shares of Care stock to World Minerals, Convalescent executed (by Fischel) investment letters covering those shares which stated, in flat contradiction to the previous contract, that the shares were acquired for Convalescent's own account and with no view to distribution. Furthermore, Convalescent never took any step toward satisfying the requirements imposed by the letters on any subsequent sale of the Care stock. Neither is it clear how Convalescent, and in turn World Minerals, intended to meet the requirements of Federal securities laws in the sale of unregistered stock.

Similarly, World Minerals agreed to transfer to petitioner its right to 40,000 shares of Care stock when the documents in the record indicate that World Minerals had acquired from Convalescent the right to only $400,000 worth of stock (approximately 26,666 shares). The matter is further complicated by the fact that World Minerals sold three other investors rights to acquire a total of 95,000 additional shares. Petitioners suggest that such a situation is not unusual and that the doctrine of after-acquired title would be applicable under the circumstances. Although the doctrine might have protected petitioner if World Minerals had acquired additional Care stock subsequent to its agreement with petitioner, there is no explanation why World Minerals agreed to transfer a "right to receive 40,000 shares" which it apparently did not have.

Any one of these inconsistencies—the delayed signing and drafting of key documents, the backdating of others, the inattentiveness to the requirements of investment letters and securities law, and the transfer of stock rights which World Minerals apparently did not have—would not by itself be controlling in our determination of the genuineness of these transactions. However, taken together, they indicate flaws in the facade which petitioners' attorneys attempted to construct, and they help reveal the true nature of petitioner's dealings with Alms and World Minerals.

We have concluded that the $60,000 which petitioner paid to Alms was not interest, and it is not necessary that we affix another label on the payment. However, it seems apparent that substantial portions of the funds which petitioner actually

provided for the payment were passed through the Margolis system and became available for the use of the Karme trust. Of the $60,000, petitioner initially supplied $10,000 from his own funds; the difference was provided to him by an Anglo Dutch loan. The $60,000 payment and the $50,000 loan resulted in a net credit in petitioner's system account of $10,000, his out-of-pocket contribution. The $10,000 was combined with petitioners' $30,000 credit with the system (resulting from a $30,000 loan to ABC Trust Co. by Ocean Enterprises, in which petitioner's father had an interest), and within days of petitioner's "interest payment" to Alms, this sum was advanced by the trust company for a White Weld stock account for the Karme trust. Later, by making a $30,000 payment on the Anglo Dutch loan, petitioner increased his out-of-pocket contribution to the system by $30,000 and received a credit in that amount. This, too, inured to the benefit of the Karme trust. On June 8, 1970, the day of petitioner's $30,000 payment to Anglo Dutch, ABC Trust Co. repaid the $30,000 loan made by Ocean Enterprises. In essence, it appears that the $40,000 stock account of the Karme trust may be traced to payments petitioner made to Alms and Anglo Dutch. Other payments of principal to Anglo Dutch were credited to petitioner on his system accounting and improved his financial position vis-a-vis the Margolis system. In this manner, petitioner continued to enjoy the use, through the Karme trust, of the funds which he supplied for the "interest" payment to Alms.[20]

Petitioners contend that the loan was not a sham because they bore a real risk of loss in the transaction, and because they had a reasonable hope that the transaction would appreciably affect their beneficial interest other than by tax reduction. See *Bridges v. Commissioner*, 325 F.2d 180, 185 (4th Cir. 1963), affg. 39 T.C. 1064 (1963). However, we have stated above our conclusion that petitioner could have had no genuine obligation to Alms until after delivery of the stock. Similarly, petitioner's chance of gain was contingent upon such delivery. In any event, the facts of

---

[20]In attributing at least some significance to the system balance, we reject the testimony of Margolis that the system accounting was merely a diary of transactions and that the system balance was essentially meaningless. We should point out that as counsel for petitioner, Margolis has what amounts to a contingency fee arrangement. Because of this financial interest in the outcome of this case, the weight of his testimony on such a critical issue must be substantially discounted.

this case differ substantially from those in which a reasonable hope of profit has been found.

In *Hill v. Commissioner*, 63 T.C. 225 (1974), which petitioners cite in support of their position in this case, the taxpayers invested in a shopping center. The Court determined that the taxpayers had made a genuine purchase of the shopping center's leases and buildings, and that they were entitled to deduct operating losses and interest. Although the taxpayers in Hill would receive no positive cash flow from their investment for about 20 years, they would eventually acquire the shopping center at a net cost substantially below its value. In another case, *Halle v. United States*, 346 F.2d 543 (4th Cir. 1965), where the taxpayer purchased bonds with borrowed funds, the court found that there was a possibility that the market value of the bonds would advance while the taxpayer held them. However, in the instant case, we have concluded that petitioners have not made a genuine purchase of anything more than a contingent right to delivery of Care stock at some unspecified future date. Petitioners herein never owned the stock from which they allegedly hoped to realize a gain.

The other cases upon which petitioners rely are factually distinguishable. In *Brock v. Commissioner*, 59 T.C. 732 (1973), where the respondent did not question the good faith of the taxpayers, the Court found that they were bona fide participants as partners in the ownership of certain property and were entitled to deduct their respective shares of interest, taxes, and expenses. Similarly, the Court of Claims in *Photocircuits Corp. v. United States*, 204 Ct. Cl. 821 (1974) (34 AFTR 2d 74–5211, 74–2 USTC par. 9558), determined (in contrast to our conclusions herein) that certain transactions between controlled corporations were conducted under fair and reasonable terms and were not shams.

The fact that petitioner may have had a good-faith belief that he had incurred a genuine indebtedness of $600,000 to Alms does not affect our determination. As the court wrote in *Lynch v. Commissioner*, 273 F.2d 867, 872 (2d Cir. 1959), affg. 31 T.C. 990 (1959):

Save in those instances where the statute itself turns on intent, a matter so real as taxation must depend on objective realities, not on the varying subjective beliefs of individual taxpayers. Beyond this, it would strain credulity to the breaking point to suppose that taxpayers had no inkling that something highly unusual was going on. * * *

See also *MacRae v. Commissioner*, 34 T.C. 20, 27–28 (1960), affd. on this issue 294 F.2d 56, 59 (9th Cir. 1961).

In accordance with the foregoing, it is held that respondent is sustained in his disallowance of petitioners' claimed interest deduction.

---

Subsequent to the filing of the report of the Special Trial Judge herein, petitioners filed a memorandum of exceptions to the findings of fact and opinion set forth in the report. The major portion of petitioners' memorandum restates objections and arguments previously made on brief and in earlier stages of the lengthy proceedings in this case, including matters discussed and disposed of in the opening portion of this report. However, petitioners have raised some additional arguments with which we now deal.

Petitioners cite *Weimerskirch v. Commissioner*, 596 F.2d 358 (9th Cir. 1979), a recent Circuit Court decision reversing an opinion of this Court (67 T.C. 672 (1977)), which had sustained a deficiency based upon a determination of the Commissioner that the taxpayer had received unreported income from the sale of narcotics. The Circuit Court held that the so-called presumption of correctness, normally attaching to a deficiency determination by the Commissioner, is not alone sufficient to sustain such a determination, absent at least some prima facie showing by the Commissioner that the taxpayer was engaged in the alleged income-producing activity. Petitioners rely upon *Weimerskirch* for the proposition that a litigant should not be placed "in the impossible position of proving a negative"; in this case, proving that the transactions in question were not a sham. See also *Elkins v. United States*, 364 U.S. 206, 218 (1960).

However, *Weimerskirch v. Commissioner, supra*, has little relevance in the instant case. This is not a situation where the Commissioner merely cries "sham" and sits back waiting for the taxpayer to prove the bona fides of the transaction.[21] Here, the Commissioner presented substantial evidence, not only attacking

---

[21]Compare *Thompson v. Commissioner*, 66 T.C. 1024 (1976), another case involving transactions planned by Margolis, in which we allowed one of the deductions in question, based upon the taxpayer's formal characterization of the transaction, having been unable "to conclude with sufficient assurance" that the transaction was other than what it appeared to be. *Thompson v. Commissioner, supra* at 1047.

the documentary framework of the transaction presented by petitioners in support of their deduction, but also establishing a collateral factual background (e.g., the "money movements" and the system accounting) against which the basic transactional structure takes on an entirely different hue. Thus, the situation is entirely different from *Weimerskirch;* our decision here is not based upon any so-called presumption of correctness of respondent's determination, but upon solid and substantial evidence presented by respondent in support of such determination.

. Petitioners next assert that respondent's determination of sham was based upon respondent's perception that petitioners exercised "control" over the various aspects of the series of transactions from which the alleged interest expense arose. They then cite two cases in which a similar position of respondent's was rejected: *Estate of Goodwyn v. Commissioner,* T.C. Memo. 1976–238; *Photocircuits Corp. v. United States, supra.* We see nothing in either of these cases of compelling relevance herein. *Estate of Goodwyn* held that the grantor of a trust was not chargeable with the income of the trust even though he exercised persuasive influence over the actions of the trustees; he did not have any enforceable right to control the trustees' actions. In *Photocircuits,* the court sustained, against a "sham" determination by the Commissioner, an arrangement for the transfer of certain technology by the taxpayer to a related domestic corporation. In addition to the obvious factual distinctions from the instant case, these cases have no more inherent relevance here than any of the myriad of cases in which the income tax characterization of a transaction by a taxpayer is challenged as not comporting with substantive reality. Any number of such cases may be cited in which such a challenge by the Commissioner was sustained. Even in *Photocircuits* itself (which involved several transactions in issue), the court sustained respondent's determinations with respect to some of the transactions on the basis that they lacked bona fide business purpose. See also *La Fargue v. Commissioner,* 73 T.C. 40 (1979); *Thompson v. Commissioner,* 66 T.C. 1024 (1976); *Lazarus v. Commissioner,* 58 T.C. 854 (1972), affd. 513 F.2d 824 (9th Cir. 1975), all involving clients of Margolis, in which the Commissioner's recharacterization of various transactions was sustained.

Finally, petitioners make reference to the doctrine of collateral estoppel (or "preclusion"), as recently expanded by the

Supreme Court in *Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979). It is not clear how petitioners would have us apply the doctrine in the instant case. In *Parklane Hosiery*, the defendant (Parklane) had been a defendant in an earlier action brought by the Securities and Exchange Commission (SEC) alleging violation of the Federal securities laws. After a nonjury trial on the merits, decision was entered against Parklane in the SEC action. Subsequently, a minority stockholder of Parklane brought another suit against the company, based upon the same wrongdoing alleged in the SEC action, and moved for summary judgment. The Supreme Court ultimately held that Parklane was precluded from again litigating the same issues which had been decided against it in the SEC case. This holding was made even though the plaintiff in the second action was not the same.

Although petitioners discuss the *Parklane* case at length, they do not clearly explain its applicability in this case. As best we understand it, petitioners apparently argue that the theory upon which respondent characterizes the transaction in question as a sham (i.e., petitioners' "control" over all of the steps of the transaction) has previously been litigated with other taxpayers and decided adversely to the Commissioner. For this, petitioners rely upon *Estate of Goodwyn v. Commissioner, supra,* and *Photocircuits* v. *United States, supra.*[22] While Parklane may support the proposition that the Commissioner in some circumstances is precluded from litigating an issue which has already been decided against him in a case involving another taxpayer, none of the cases referred to by petitioners involves the same issue as that involved in the instant case: Whether the $60,000 paid by petitioner to Alms represented true interest on a bona fide indebtedness. Certainly, neither *Parklane* nor any other expression of the collateral estoppel doctrine can be said to preclude litigation of a *legal* theory (i.e., the "sham" transaction principle) in a case involving a set of facts never previously litigated. Thus, we find petitioners' reliance upon *Parklane* to be without merit.

To reflect respondent's concession of the negligence penalty,

*Decision will be entered for the respondent in the amount of the deficiency only.*

---

[22]At another point in their statement of exceptions, petitioners refer to *Hill v. Commissioner,* 63 T.C. 225 (1974); *Brock v. Commissioner,* 59 T.C. 732 (1973); *Abraham v. Commissioner,* T.C. Memo.

---

1974–19; *Estate of Cole v. Commissioner,* T.C. Memo. 1973–74, all cases involving clients of Margolis in which the Commissioner failed in whole or in part in his attempt to disallow deductions by challenging the substance of certain transactions.

