T.C. Memo. 1997-148


UNITED STATES TAX COURT


3-KOAM COMPANY, A PARTNERSHIP, MY HAT, INC., TAX MATTERS PARTNER,
Petitioner <u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 4232-95.                    Filed March 20, 1997.


<u>David M. Kirsch</u>, for petitioner.

<u>Kimberley J. Peterson</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

PARR, <u>Judge</u>:  3-Koam Company partnership (3-Koam), My Hat, Inc. (My Hat or petitioner), Tax Matters Partner, petitioned the Court under section 6226 to readjust respondent's adjustments of partnership items flowing from the partnership.  By notice of final partnership administrative adjustment (FPAA) dated February 16, 1995, respondent determined adjustments to items claimed on

3-Koam's 1990 U.S. Partnership Return of Income (Form 1065) of $111,962.

After concessions by the parties,[1] the issues for decision are: (1) Whether pursuant to section 174, 3-Koam may deduct research and development expenses allegedly incurred in 1990.[2] We hold it may not, except to the extent allowed by respondent.[3] (2) Whether pursuant to section 166, 3-Koam may claim a $30,000 bad debt deduction in 1990. We hold it may not.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulated facts and the accompanying exhibits are incorporated into our findings by this reference. At the time the petition in this case was filed, 3-Koam's principal place of business was in Fremont, California. During the year in issue, 3-Koam used the accrual method of accounting and filed its returns on a calendar year basis.

---

[1] For 1990, petitioner concedes the following amounts: (1) ($3,629) for meals and entertainment, (2) $2,658 for automobile expenses, (3) $194 for insurance, (4) $399 for depreciation, and (5) $340 for interest. These concessions will be reflected in the parties' Rule 155 computation.

[2] All section references are to the Internal Revenue Code in effect for the taxable year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. All dollar amounts are rounded to the nearest dollar, unless otherwise indicated.

[3] On its 1990 Form 1065, 3-Koam deducted $90,000 for research and development; in her notice of deficiency respondent disallowed $82,000 of such amount.

My Hat, the tax matters partner for 3-Koam, is a California corporation with its principal place of business in Cupertino, California.

From the time of its inception in 1987 through the year in issue, the partners of 3-Koam, and their respective interests in partnership capital, profits, and losses were as follows:  My Hat, of which Edward Houston (Houston) is the sole shareholder (25 percent), Unpo Paik (Paik) (25 percent), and Nae Yeal Lee (Lee) (50 percent).  The initial capital of the partnership was a $50,000 line of credit extended by Lee; Paik and Houston contributed a new product and technical know-how.  Houston is a metallurgical and component engineer and Paik has a college degree in computer science.

Research and Development Deduction

3-Koam is primarily engaged in the business of sub-contracting, packaging, and assembling electronics products, including video games.  When customers would return defective game cartridges, such as Nintendo type games to a retailer, the retailer would send the cartridges to the manufacturer, who, in turn, would ship them to 3-Koam for testing.  If possible, 3-Koam would repair the product, repackage it, and send it back to the manufacturer for resale.  If 3-Koam could not repair a product it would return it to the manufacturer.  A substantial part of 3-Koam's business also included assembling arcade game cabinets for its customers who manufactured video game boards.

In September of 1990, Houston and Paik formed a second partnership named Inkax. Thereafter, Inkax, contacted Dooyong Industries Co., Ltd., (Dooyong), a Korean video game designer, for the purpose of determining whether Dooyong could develop two prototype video games for Inkax. Sometime between May and September of 1990, Dooyong began developing video game boards for Inkax. Inkax and Dooyong did not execute a formal contract memorializing their arrangement. From the time of its formation until the date of trial, the only business that Inkax had ever engaged in was the research and development transaction with Dooyong.

In October of 1990, 3-Koam issued a purchase order to Inkax for the research and development of two video games. In November and December of 1990, Inkax sent three invoices to 3-Koam totaling $90,000 for the cost of video game development. Thereafter, 3-Koam paid Inkax $90,000, consisting of two checks in December of 1990 for $30,000 and $40,000, and one check in March of 1991 for $20,000. On its 1990 Form 1065, 3-Koam deducted $90,000 in research and development expenses. Sometime after March 21, 1991, Inkax returned the $90,000 to 3-Koam in one or more payments.

On December 3, 1990, Dooyong sent Inkax an invoice for $82,000, reflecting the charge for video game development. On March 17, 1991, in exchange for the two video games, Inkax issued

a 0 percent interest promissory note to Dooyong for $82,000. The maturity date of the note was March 17, 1993.

On March 29, 1991, Dooyong shipped two video games[4] to 3-Koam. For U.S. Customs' purposes, Dooyong declared $4,500 as the total value of the games. This was the only import transaction between Dooyong and 3-Koam. Thereafter, 3-Koam test marketed its product by placing one of the games in an arcade in Santa Clara, California, and the other in Santa Cruz. After 4 weeks, 3-Koam determined that the games did not attract sufficient customers and had no residual value, and therefore decided to abandon the idea of distributing arcade video games. 3-Koam never attempted to sell the games to any other person or entity.

Neither Inkax nor 3-Koam ever paid Dooyong for its development efforts. Moreover, at the time of trial, Inkax had closed its bank account and dissolved. Dooyong has never taken any legal recourse against 3-Koam or Inkax to enforce the $82,000 promissory note issued by Inkax.

On its 1990 U.S. Partnership Return of Income (Form 1065), the only transactions Inkax reported were the accrual of $90,000 of income from 3-Koam, and an accrual of $82,000 as cost of goods sold, reflecting the promissory note issued to Dooyong, which produced an $8,000 operating profit. Houston and Paik each

---

[4]    Dooyong actually shipped 3-Koam video game circuit boards, which 3-Koam then assembled into two video game arcade cabinets.

reported their $4,000 distributive shares of such profit on their 1990 individual Federal income tax returns (Forms 1040).

Bad Debt Deduction

Sometime around 1989, Paik was introduced to Sung Ok Sue (Sue) by family friends. Thereafter, Paik met with Sue on several occasions. Sue was engaged in a variety of businesses, including a video arcade and rental establishment.

In November of 1989, Paik personally applied for, and received, a $30,000 loan from Union Bank (Bank). The loan was secured with a certificate of deposit (CD) belonging to 3-Koam. Upon receiving the loan proceeds Paik transferred the funds to Sue. In exchange, Sue signed a promissory note for the $30,000, which was made payable to 3-Koam. The note was unsecured, it had a 0 percent interest rate, and no maturity date. Sue never paid the $30,000 to 3-Koam, and 3-Koam has never made any formal demand for the funds. 3-Koam has not hired a collection agency, nor has it taken any other legal action against Sue to obtain the money.

The bank used 3-Koam's CD to satisfy the $30,000 outstanding loan. 3-Koam deducted the $30,000 as a bad debt on its 1990 Form 1065.

OPINION

Issue 1. Research and Development Expenditures

Respondent determined that 3-Koam may not claim an $82,000 research and development deduction for 1990, because the alleged agreement entered into by 3-Koam with Inkax was a sham transaction, lacking both a business purpose and economic substance. Petitioner asserts that 3-Koam properly incurred and accrued a research and development expense in 1990, and therefore may deduct such amount pursuant to section 174 and the regulations thereunder.

Respondent's determinations are presumptively correct, and petitioner bears the burden of proving otherwise. Rule 142(a), Welch v. Helvering, 290 U.S. 111, 115 (1933); Durando v. United States, 70 F.3d 548, 550 (9th Cir. 1995).

As a general rule, a taxpayer may deduct research or experimental expenditures paid or incurred during the taxable year in connection with its trade or business. Sec. 174(a); Snow v. Commissioner, 416 U.S. 500, 504 (1974). Section 174 not only applies to expenses paid or incurred directly by the taxpayer, but it also includes expenditures paid or incurred for research and development carried on in the taxpayer's behalf by another person or organization. Sec. 1.174-2(a)(2), Income Tax Regs.

A taxpayer is generally free to structure its business transactions as it pleases, though motivated by tax reduction considerations. Gregory v. Helvering, 293 U.S. 465 (1935);

Casebeer v. Commissioner, 909 F.2d 1360 (9th Cir. 1990), affg. T.C. Memo. 1987-628, affg. Larsen v. Commissioner, 89 T.C. 1229 (1987), affg. Sturm v. Commissioner, T.C. Memo. 1987-625, affg. Moore v. Commissioner, T.C. Memo. 1987-626; Rice's Toyota World, Inc. v. Commissioner, 81 T.C. 184, 196 (1983), affd. in part on this issue, revd. in part 752 F.2d 89 (4th Cir. 1985). However, it is well settled that the substance of a transaction and not the form will control its tax consequences. Frank Lyon Co. v. United States, 435 U.S. 561, 573 (1978). A transaction entered into solely for the purpose of tax reduction, which is devoid of economic, commercial, or legal purpose other than the expected tax benefits, is a sham without effect for Federal income tax purposes. Id.; Rice's Toyota World, Inc. v. Commissioner, supra at 196. In Rice, we stressed that where "a taxpayer, cognizant of potential tax benefits, enters into a transaction of questionable economic worth, the tests developed under the sham transaction doctrine are applied to determine whether a threshold level of business purpose and economic substance is present." Id.

After careful consideration of all the facts in this case, we conclude that the transfer of the $90,000 from 3-Koam to Inkax is not a bona fide outlay for research and development, because the transaction lacks sufficient economic substance. The record shows that there is little, apart from tax considerations, to justify 3-Koam's entry into the purported research and

development transaction with Inkax.  Although no single fact is determinative of this conclusion, numerous factors taken collectively, as discussed herein, demonstrate that such transaction was a sham.

The agreement between 3-Koam and Inkax consists of a vague, one-page letter, which lacks any discussion of the respective rights of the parties, a detailed description of the product configuration, performance criteria by which to measure the product's suitability for its intended use, or the price to be charged for its development.  As such, we find the purported research and development contract to be a letter between related partnerships, intended merely to lend credence to Inkax's existence, as a shell partnership created by 3-Koam solely for tax avoidance purposes.  See Frank Lyon Co. v. United States, supra at 581.

3-Koam was haphazard in its efforts to enter into the video game distribution market.  3-Koam had no prior experience in developing and marketing video games.  Its knowledge of the video game business was limited to testing existing products and assembling video game cabinets for its customers.  No market projection or appraisal was performed to determine whether the video games had any potential of producing a profit, or had an economic value approximating the $90,000 that 3-Koam ostensibly paid for them.  The extent of 3-Koam's marketing efforts was to place one video game in an arcade in Santa Clara and another in

Santa Cruz. After 4 weeks, 3-Koam determined that the games did not attract sufficient customers and had no residual value; it then abandoned the purported plan to distribute the games. Finally, 3-Koam never attempted to sell the games in an effort to recoup some of its alleged $90,000 investment.

The absence of arm's-length dealings among the parties, for example, where two entities under common ownership are involved in a "money movement transaction" is a factor often present in sham transactions. Karme v. Commissioner, 73 T.C. 1163, 1186 (1980), affd. 673 F.2d 1062 (9th Cir. 1982). In Karme, taking into account the relationship between the two parties, we found that the taxpayer was not genuinely at risk for any money, despite purported indebtedness between the entities. Id. at 1189. Two of 3-Koam's partners formed Inkax for the alleged purpose of marketing video games for 3-Koam; plainly the partnerships are closely related.

On its 1990 Form 1065, 3-Koam deducted a $90,000 research and development expense; however, neither 3-Koam nor Inkax ever paid Dooyong for its development efforts.[5] More importantly,

---

[5] At trial and on brief, 3-Koam claims that Inkax's failure to pay Dooyong has absolutely no bearing on the propriety of the accrual by 3-Koam of the $90,000 research and development expenditure, because the taxpayer here is 3-Koam, not Inkax. As such, petitioner argues that 3-Koam properly "paid or accrued" the amount claimed as a deduction pursuant to sec. 461(a). However, accounting methods or descriptions, without more, do not lend substance to that which has no substance. Frank Lyon Co. v. United States, 435 U.S. 561, 577 (1978) (citing Commissioner v.
(continued...)

3-Koam concedes that sometime after March of 1991, it received the $90,000 back from Inkax, purportedly in the form of a loan.

Respondent argues, however, that the $90,000 transferred back to 3-Koam fails to exhibit any indicia of a loan, and in substance is actually a repayment of the proceeds originally disbursed by 3-Koam to Inkax pursuant to the alleged research and development agreement. See Frierdich v. Commissioner, T.C. Memo. 1989-393, affd. 925 F.2d 180 (7th Cir. 1991) (factors to consider in deciding whether a bona fide loan exists between related parties).

On brief, petitioner argues that we need not decide this point, because whether or not Inkax lent the $90,000 to 3-Koam in 1991 has no bearing on whether 3-Koam actually incurred the research and development expenses; and therefore it may properly deduct the expense in 1990. See sec. 461(a) (all events test). For the reasons just discussed supra at note 5, we disagree.

The record shows that at the time 3-Koam and Inkax entered into the purported loan transaction, 3-Koam never intended to repay Inkax, and Inkax never intended to enforce monetary payment. See Karme v. Commissioner, supra. 3-Koam did not issue

---

[5](...continued)
Lincoln Sav. & Loan Association, 403 U.S. 345, 355 (1971)). The question of the appropriate accounting treatment may be answered only when the transaction is determined to be legitimate. A sham transaction is not entitled to favorable tax treatment; therefore 3-Koam's accounting method is irrelevant.

Inkax a promissory note for the $90,000, nor did Inkax require any security on the purported loan.

Moreover, 3-Koam never paid, nor will it ever pay Inkax, because Inkax was dissolved immediately after engaging in the alleged research and development transaction.  In fact, the only business that Inkax ever engaged in was the one transaction with Dooyong, and once Inkax's "limited function had been exercised, it was immediately put to death."  Gregory v. Helvering, 293 U.S. 465, 470 (1935).

Thus, the circular movement of money in 3-Koam's case and the use of Inkax, a partnership created and controlled by Houston and Paik, as a conduit for such funds, establish that 3-Koam did not in substance incur the $90,000 expense it claimed for research and development.  Karme v. Commissioner, 73 T.C. at 1193.

Another key factor we consider in analyzing a sham transaction is a grossly inflated purchase price.  Falsetti v. Commissioner, 85 T.C. 332, 349 (1985); Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1240-1241 (1981).  In Grodt, we analyzed whether a transaction was a true sale and found that a normal attribute of an arm's-length sale is a purchase price "at least approximately equal to [the item's] fair market value".  Grodt & McKay Realty, Inc. v. Commissioner, supra at 1240-1241. A "totally disproportionate" purchase price belies a taxpayer's contention that a true sale occurred.  Id. at 1240-1241.

3-Koam stipulated that $4,500 was the value of the video games declared for U.S. Customs' purposes. At trial, Houston testified that 3-Koam later determined the video games to have no residual value. Thus, it appears that the $90,000 was a grossly inflated amount compared to the video games' actual value.

In sum, based on the entire record and the facts discussed herein, petitioner has failed to meet its burden of proving that the alleged research and development transaction entered into by 3-Koam with Inkax had economic substance. Accordingly, we sustain respondent's determination with respect to this issue.

Issue 2. Bad Debt Deduction

Respondent determined that 3-Koam may not deduct $30,000 as a bad debt on its 1990 Form 1065, because petitioner failed to establish that 3-Koam made a bona fide business loan.[6] Petitioner asserts that 3-Koam properly deducted on its 1990 Form 1065, a business bad debt that was owed to 3-Koam by Sue and became worthless in 1990.

Section 166(a) and the regulations thereunder allow a taxpayer to deduct all or part of any "bona fide" debt that becomes worthless during the taxable year. See Calumet Indus., Inc. v. Commissioner, 95 T.C. 257, 284 (1990). For purposes of

---

[6]     In the alternative, respondent argues that 3-Koam has not shown worthlessness during 1990 as required by sec. 166(a)(1). We find, as discussed in the opinion herein, that 3-Koam did not make a bona fide business loan. Thus, we do not find it necessary to address the issue of worthlessness.

section 166(a), a "bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money."  Sec. 1.166-1(c), Income Tax Regs.  Whether a bona fide debtor-creditor relationship exists is a question of fact to be determined upon consideration of all the pertinent facts in a particular case. Fisher v. Commissioner, 54 T.C. 905, 909 (1970).

In the case at bar, we must determine whether the advances to Sue were made in exchange for a bona fide debt.  Petitioner bears the burden of proof on this issue.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); Durando v. United States, 70 F.3d 548, 550 (9th Cir. 1995).

At trial, Paik testified that he has known Sue since 1989 when they were introduced through family and friends. Thereafter, the two met on several occasions.  In November of 1989, Paik personally applied for and received a $30,000 loan from the bank, and according to petitioner's argument, advanced the proceeds to Sue on behalf of 3-Koam.  In February of 1990, Sue signed a $30,000 promissory note, made payable to 3-Koam.

We note that we closely scrutinize the form of an alleged business arrangement to determine its true substance where parties have a personal relationship, such as the one between Paik and Sue.

At trial, Paik and Houston claimed that Sue received the $30,000 as a loan from 3-Koam for the purpose of enabling Sue to

open an arcade, where 3-Koam could place its video games.  On brief, petitioner argues that the loan application supports Paik's and Houston's contention, because it lists "partial cash needs for a business investment" as the purpose for obtaining the loan proceeds.

We disagree.  Petitioner's reliance on the loan application is self-serving, because Paik supplied the bank officer with the information found on such document.   Furthermore, petitioner has failed to prove that the advance of $30,000 created a bona fide debtor-creditor relationship between Sue and 3-Koam.  3-Koam failed to perform a credit check on Sue, nor did it obtain collateral from Sue to secure the alleged loan.  Furthermore, the $30,000 promissory note that Sue signed had a 0 percent interest rate, no maturity date, and no fixed schedule of repayments.

Moreover, not only did Sue fail to repay the $30,000, but 3-Koam never made any demand for the funds, nor did it take legal action against her.  These are the types of reasonable actions a creditor would institute against a debtor.  Newman v. Commissioner, T.C. Memo. 1982-61.  Thus, we note that a taxpayer cannot justify a bad debt deduction merely because it elects not to enforce the obligation.  See Southwestern Life Ins. Co. v. United States, 560 F.2d 627, 644 (5th Cir. 1977).

In sum, we find that petitioner failed to sustain its burden of proving that 3-Koam made a bona fide loan of $30,000 to Sue.

Accordingly, we sustain respondent's determination with respect to this issue.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.